# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WAUNYE CALM, BRANDON
GATEWOOD, ISAIAH HARBER,
JYAIRE HENRY, DEWITT JOHNSON,
ZAKEE LLOYD, DENNIS WILLIAMS,
and DEVON YOUNG,

      Plaintiffs,

      v.

TERRA TAYLOR, in her official capacity
as Commissioner of the Delaware
Department of Correction,

      Defendant.

C.A. No. 2026-0576-JTL

## OPINION DENYING PRELIMINARY INJUNCTION

Date Submitted: June 18, 2026
Date Decided: August 11, 2026

Jason H. Beehler, Jared Silberglied, Andrew Bernstein, ACLU OF DELAWARE, Wilmington, Delaware; *Attorneys for Plaintiffs Waunye Calm, Brandon Gatewood, Isaiah Harber, Jyaire Henry, Dewitt Johnson, Zakee Lloyd, Dennis Williams, and Devon Young.*

Joseph S. Naylor, Nicholas E. Skiles, Allison Texter, Robert S. Goldman, Bryan P. Smith, SWARTZ CAMPBELL LLC, Wilmington, Delaware; Jennifer Kate Aaronson, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware; *Attorneys for Defendant Terra Taylor, in her official capacity as Commissioner of the Delaware Department of Correction.*

**LASTER, V.C.**

*Oleoresin capsicum* ("OC") is a chemical agent derived from the heat-generating compounds in chili peppers. Exposure to OC causes intense pain. Short-term effects include difficulty breathing, uncontrollable coughing, temporary blindness, and a burning sensation in the eyes and throat and on the skin.

Those attributes make OC an effective non-kinetic weapon. The Delaware Department of Correction (the "Department") uses law-enforcement-grade OC weapons to maintain security in Delaware's prisons.

The plaintiffs are prisoners in the Department's care. They contend that correction officers frequently use OC weapons on prisoners without permitting decontamination, even after a prisoner has become compliant and any disturbance has been brought under control. The plaintiffs do not challenge any initial use of force. They challenge only the absence of decontamination once a prisoner has become compliant and the area secured. As shorthand, this decision refers to that scenario as "Secure Decontamination."

The plaintiffs contend that rather than facilitating Secure Decontamination, correction officers force prisoners to go for hours and often days without decontamination. They particularly object to being strip searched without first decontaminating their hands. During a strip search, prisoners must sweep their mouths with their fingers and handle their genitals. Undergoing a strip search without first decontaminating their hands invariably transfers OC to sensitive areas. As shorthand, this decision refers to that form of Secure Decontamination as "Pre-Strip-Search Decontamination."

The prisoners contend that failing to facilitate Secure Decontamination constitutes a "cruel punishment" that violates Article I, Section 11 of the Delaware Constitution (the "Cruel Punishment Clause"). They have sued the Commissioner of the Department in her official capacity on behalf of a putative class of all incarcerated persons in Delaware, defined to include both convicted prisoners and pretrial detainees.[1]

After this litigation began, the Commissioner adopted a new policy on decontamination (the "Decontamination Policy"). She argues that the Decontamination Policy renders this litigation moot, but that is not so. After a trial, the court could declare that failing to facilitate Secure Decontamination violates the Cruel Punishment Clause. The court also could declare that failing to permit Pre-Strip-Search Decontamination violates the Cruel Punishment Clause. The court could issue mandatory injunctive relief addressing either issue. The Decontamination Policy does not resolve those questions, so the case is not moot.

The plaintiffs currently seek a preliminary injunction barring the Department from using OC until the Department's implementation of an effective decontamination policy or a final adjudication on the merits. That motion is denied.

The plaintiffs have established a reasonable probability of success on the merits of their claim. It is reasonably likely that a failure to facilitate Secure

_____

[1] In pursuing this litigation, the plaintiffs have not distinguished between the two groups, and they generally use the term "prisoners" to refer to the category of people at issue. This decision follows suit.

Decontamination violates the Cruel Punishment Clause. Contrary to the Commissioner's position, the Cruel Punishment Clause has meaning that goes beyond the Eighth Amendment. This decision adopts a test that asks whether a condition of confinement creates an objectively significant risk of serious harm. If it does, then the Commissioner can justify the condition as reasonably necessary for incapacitation, deterrence, or rehabilitation. In making those assessments, a court must show deference to the Commissioner's judgment while performing its independent constitutional function.

This test does not require that a prison official act with cruel intent, and it therefore does not require a showing of subjective knowledge and deliberate indifference. If the plaintiffs were seeking damages for a violation of the Cruel Punishment Clause—a claim that Delaware law does not yet recognize—then some requirement of *scienter* or, at a minimum, gross negligence might well make sense. The plaintiffs here seek declaratory and injunctive relief.

It is reasonably likely that not facilitating Secure Decontamination—and particularly Pre-Strip-Search Decontamination—fails the Delaware test. It is reasonably likely that not facilitating those forms of decontamination creates an objectively significant risk of serious harm. That failure cannot be justified as reasonably necessary for incapacitation, deterrence, or rehabilitation. To reiterate, the plaintiffs here do not challenge the initial use of force, which is easily justifiable as reasonably necessary for incapacitation (stopping non-compliant conduct), deterrence (preventing non-compliant conduct in the future), and rehabilitation

3

(teaching the prisoner not to engage in non-compliant conduct and helping maintain a secure facility where rehabilitation can occur). Once a prisoner is compliant and the area secured, failing to facilitate Secure Decontamination serves none of those purposes. The prisoner simply experiences arbitrarily harsh suffering for an arbitrary length of time. At best, the additional pain might be thought to serve deterrence, but it is not reasonably necessary to achieve deterrence, and the arbitrariness of the additional punishment renders it disproportionate and cruel.

The plaintiffs have also shown a risk of irreparable harm. The long-term effects of extended exposure to OC are serious. Prolonged exposure to OC can result in eye injuries, lung problems, and skin injuries. Eye injuries include glaucoma, corneal scarring, corneal epithelial defects (the loss of the eye's outer cell layer), irregular astigmatism (a condition where the cornea becomes uneven), cataracts, and decreased tear production. Lung problems can include reduced respiratory capacity, scarring, and respiratory failure, and the effects can be more severe for individuals with health conditions like asthma. Skin injuries can include lacerations, chemical burns, blisters, and persistent dermatitis. Other jurisdictions have experienced deaths due to OC exposure without decontamination.

The plaintiffs have nevertheless failed to show that the balance of hardships favors a preliminary injunction. They ask the court to enjoin the Department from using OC, but OC is essential for maintaining order in Delaware's prisons. If correction officers could not use OC, they would have to resort to the weapons of the past, like police batons, nightsticks, and truncheons. Or they would have to use

4

tasers, which are less reliable than OC and carry their own health risks. The Commissioner testified credibly that Delaware's prisons would become more dangerous, not less, without OC. Barring the use of OC would threaten greater harm than the injunction would prevent.

At trial, the plaintiffs will have the burden of proving that a lack of Secure Decontamination violates the Cruel Punishment Clause and that the Decontamination Policy is constitutionally inadequate. The plaintiffs have pointed to gaps in the Decontamination Policy, including its failure to address (1) indirect OC contamination, (2) Pre-Strip-Search Decontamination, and (3) the need for correction officers to facilitate Secure Decontamination. Comparing the Decontamination Policy with the federal policy on decontamination reveals additional gaps. Determining whether these issues warrant a declaratory judgment or targeted mandatory injunctive relief will require a trial and expert testimony.

The preliminary injunction is denied. Because of the importance of the issue presented, the parties must bring the case to trial within 120 days.

## I. FACTUAL BACKGROUND

The facts are drawn from the evidence presented during the hearing on the plaintiffs' application for a preliminary injunction. During that hearing, the Commissioner and four other witnesses testified live. The parties introduced

5

depositions, affidavits, documents, photographs, and videos into evidence.[2] At this stage of the case, the court does not make post-trial findings of fact. The factual account rather represents what the court predicts the evidence at trial is reasonably likely to show, based on the record developed to date.

## A.     What Is OC?

OC is a chemical agent derived from capsaicinoids, which are the heat-generating compounds in chili peppers. The potency of a product containing OC can be measured using Scoville Heat Units. The higher the number, the more intense the heat. Ordinary bell peppers have a Scoville heat rating of zero SHU. Jalapeño peppers range from 3,500 to 8,000 SHU. A cayenne pepper falls between 30,000 and 50,000 SHU. A habanero chili pepper falls between 200,000 and 350,000 SHU.

A variety of OC weapons exist on the market. Law-enforcement-grade products start at potencies of 1 million SHU. Bear spray typically ranges from 2 million to 4 million SHU.

OC exposure can result from direct physical contact, indirect or secondary contact, or area contamination. The effects of OC exposure depend on the potency of the product and the extent of contact. Serious symptoms typically subside over the

---

[2] Citations in the form "[Name] Tr." refer to witness testimony from the hearing transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. The parties used already-docketed exhibits during the preliminary injunction hearing. Because the parties had already identified and relied on those exhibits, the court did not require the parties to mark and introduce them separately.

course of hours. OC is biodegradable and decomposes naturally. Depending on conditions, it becomes undetectable within about ten days.[3]

## B.     The Department And Its Use Of OC

The Department is the largest law enforcement agency in Delaware and the second largest agency in general. It operates a unified correctional system that includes Level 5 prison facilities, Level 4 treatment facilities, work release facilities, community-based probation, parole, and pretrial supervision. The Department has around 2,600 employees.

At any one time, the Department incarcerates 5,000 to 6,000 individuals in Level 5 prison facilities and 350 to 375 in Level 4 treatment facilities. Approximately 11,000 are under supervision through probation, parole, pretrial supervision, and other programs.

The Department uses OC weapons when maintaining security in Delaware's prisons. The Department deploys the Level 3 Sabre Red ("Sabre Red") line of products.

On the Scoville scale, Sabre Red has a heat rating of 2 million SHU, the starting potency for bear spray.[4] Another metric for measuring OC potency is major

---

[3] *See* Dkt. 1 Ex. A at DOC_SCI_0041440 (Department training presentation stating that "[n]atural biodegrading of OC takes 10 days"). The fact that OC takes ten days to biodegrade naturally does not mean that the OC remains concentrated enough to generate symptoms until that point.

[4] *See* Taylor Tr. 201–02.

capsaicinoid content ("MCC"), which measures the concentration of heat-producing compounds. Sabre Red has 1.33% MCC, the highest MCC rating that Sabre offers for use on humans. The Department has explained that Sabre Red "is the highest MCC rating available through Sabre without using the Bear Attack Spray line which is not safe for human use. A can of the Bear Spray exploded on a person, and it literally peeled the skin of [sic] the subject."[5]

Each correction officer receives the Sabre Red MK-2 Trigger Top handheld canister, which contains Sabre Red in aerosol form. The Department stocks other OC weapons containing Sabre Red, including aerosol grenades, sprayable aerosol gel, a high-capacity "Cell Buster" fogger spray, pepper-ball guns, and a 40-millimeter OC "muzzle blast" fired from a launcher.[6]

Sabre Red causes intense pain and a burning sensation in the eyes and throat and on the skin. Other short-term physical effects may include immediate respiratory inflammation, difficulty breathing, uncontrollable coughing, and temporary blindness.[7] The Department identifies short-term psychological effects including a "feeling of suffocation," a "sense of helplessness," an overwhelming sense of fear and panic, and an "inward focus on pain."[8] A human exposed to OC may be temporarily

---

[5] Dkt. 1 Ex. A at DOC_SCI_0041433.

[6] *See* Taylor Tr. 131–33, 169–71.

[7] *See id.* at 176–77.

[8] Dkt. 1 Ex. A at DOC_SCI_0041437 (capitalization altered).

8

unable to hear what an officer is saying.[9] When sprayed at a close distance, OC can penetrate eye and skin tissue through a process called hydraulic needling, causing lacerations and heightened pain.[10]

## C. Decontamination

Decontamination is the process of removing OC after exposure. Decontamination allows the effects of OC to dissipate as quickly as possible.

OC weapons come with instructions for decontaminating exposed individuals. Sabre Red's manufacturer provides an instructional video for decontaminating an inadvertently sprayed correction officer.[11] It calls for flushing the subject's eyes with fresh water for thirty seconds, using a decontaminating agent on the individual's face for thirty seconds, and repeating that procedure four more times. It then calls for rinsing each eye for five minutes. The video also suggests applying a soothing solution. It warns that "if you want . . . these painful effects to go away as fast as possible, you have to follow these instructions."[12]

---

[9] *Id.*

[10] *See id.* at DOC_SCI_0041441–43.

[11] *See* Dkt. 4 at 15 (citing *SABRE DECON – Guidelines for Proper Use*, https://www.police1.com/police-products/less-lethal/videos/sabre-decon-guidelines-for-proper-use-9tQc7ZWQawznRwbX/ (Jan. 9, 2024)).

[12] *SABRE DECON – Guidelines for Proper Use*, https://www.police1.com/police-products/less-lethal/videos/sabre-decon-guidelines-for-proper-use-9tQc7ZWQawznRwbX/ (Jan. 9, 2024); *see* Dkt. 58 Ex. 7 at 3 (warning label on Sabre Red pepper ball product stating: "If breathing is difficult, administer oxygen. Flush eyes and other contaminated areas IMMEDIATELY with large amounts of cool

An advisory label on one of the law-enforcement-grade Sabre Red products also addresses decontamination. It states:

> After restraining subject, move to fresh air away from contaminated area and verbally reassure subject. IMMEDIATELY request medical attention if subject has preexisting medical conditions or other medical issues. If appropriate, remove contaminated clothing. IF ON SKIN: Wash with plenty of soap and water. DO NOT rub or use creams, lotions, oils or salves. IF IN EYES: Rinse cautiously with water for several minutes. DO NOT RUB EYES! Only qualified medical personnel should remove contacts. Continue to rinse. Periodically monitor subject until recovered. IF SYMPTOMS PERSIST: Get medical advice/attention.[13]

As discussed below, Department training materials call for similar decontamination measures.

Civilian-grade versions of Sabre Red likewise call for decontamination. The Safety Data Sheet for "SABRE Red USA Civilian" instructs that a victim's eyes must be flushed "with cool water for at least 15 minutes, or until relieved."[14] A victim's skin must be "flush[ed] with cool water for at least 15 minutes" and "wash[ed] with mild soap and water."[15]

---

water, expose to fresh air. Contact lenses should be removed by subject or qualified medical personnel and must be discarded. DO NOT rub contaminated areas or apply creams, salves, oils, lotions, or burn cream, which can trap irritant on the skin."); *id.* at 4–5 (same but without stating who should remove contact lenses); *id.* Ex. 9 at 2 (warning label on Sabre Red fogger product addressing "FIRST AID" and advising exposure to "FRESH AIR," flushing "EXPOSED SKIN AREAS WITH CLEAN WATER," use of "5 – 10% SODIUM BICARBONATE," and flushing eyes).

[13] Dkt. 58 Ex. 8.

[14] Dkt. 57 Ex. 2.

[15] *Id.*

10

Failing to decontaminate after exposure to OC is dangerous and can be lethal. Prolonged exposure can result in eye injuries, lung problems, and skin injuries. Possible eye injuries include glaucoma, corneal scarring, corneal epithelial defects, irregular astigmatism, cataracts, and decreased tear production. Lung problems may include scarring, decreased lung capacity, and respiratory failure, with individuals suffering from health conditions like asthma facing greater risk of more severe effects. Skin injuries can include chemical burns, severe erythema (a skin reaction characterized by significant blistering), and persistent dermatitis. Deaths due to OC exposure without decontamination have been reported in other jurisdictions. Thankfully, Delaware has not yet faced a lethal OC incident.

## D. The Department's Use-Of-Force Policy

The Department maintains a use-of-force policy that states:

**POLICY:** The Department recognizes that offenders may at times demonstrate violent and destructive behaviors that may seriously endanger the health and safety of staff, offenders or the public. It is understood that the need to use force occurs most often in situations that are unplanned and unanticipated. Split-second decision-making is often necessary. The Department has adopted the attached Use of Force Model to guide staff in making use of force decisions. The Use of Force Model identifies a graduated approach to the use of force in situations that may be experienced by employees. All employees responsible for offender supervision are trained regarding the Use of Force Model and this policy as a means to reduce and prevent the need to use force and to establish guidelines of reasonableness when force is required.

The use of force must be reasonable under the circumstances, and should be used only when no other reasonable alternative is available. If possible, staff shall take reasonable steps to deescalate a situation or otherwise prevent the need to use of force. The use of force may not be used as a retaliatory or disciplinary measure.

The use-of-force policy encompasses OC weapons but does not address

11

decontamination.[16] The use-of-force policy authorizes using reasonable force to obtain compliance with orders from staff and to "(1) control disruptive or violent offenders, (2) enforce or restore order, (3) defend oneself against unwanted physical contact or harm, (4) protect other persons from imminent death, serious bodily harm, or physical harm, (5) protect state property, (6) prevent escapes or capture escaped/ing inmates, (7) administer non-emergent and emergent involuntary medications prescribed by a qualified health professional and (8) apply clinical or therapeutic restraints authorized by a qualified health professional."[17]

The Department tracks uses of force in its facilities, where there are around 650 to 750 use-of-force incidents every year.[18] OC weapons are the only weapons that Delaware correction officers carry.[19] As a result, the vast majority of the Department's use-of-force incidents involve OC.[20] On average, correction officers deploy OC in Delaware's prisons around twice per day.[21]

The plaintiffs do not challenge any decision to use OC. They challenge failures by correction officers to facilitate Secure Decontamination after OC use. The

---

[16] Taylor Tr. 108–09.

[17] Dkt. 1 Ex. L at 1.

[18] Taylor Tr. 111.

[19] *Id.* at 97 ("Correction officers only have OC spray and handcuffs.").

[20] *Id.* at 111, 203–04.

[21] *Id.* at 203–04 (agreeing that the Department "on average deploys OC more than 600 times per year").

12

prisoners concede that the security of a facility and the safety of its occupants take precedence. They maintain that correction officers fail to permit Secure Decontamination, including Pre-Strip-Search Decontamination.

## E.    The Department's Training Guidelines

Before this litigation, the Department did not have a written decontamination policy. Correction officers used their own judgment. The evidence suggests that Secure Decontamination did not take place.[22]

Before this litigation, the Department trained correction officers on the use of OC weapons and proper decontamination. Correction officer candidates attending the Department's academy must complete a twelve-week training course that includes a day-and-a-half unit on OC.[23] Correction officers must score seventy percent or higher on a written test covering the training.

---

[22] *See, e.g.*, Dkt. 58 Ex. 10 at 10 (internal Department report noting nurse's report that when a prisoner is sent to the medical facility, "[t]here is no actual decontamination other than removing an inmates [sic] clothing and changing him into an orange inmate uniform"); Taylor Dep. 13–14 (Commissioner testifying that she was unaware of any obligation on the part of the Department's medical provider to offer decontamination); Dkt. 8 Ex. P at 175 (Commissioner's September 10, 2024 deposition in *Davis v. Neal*, No. 1:21-cv-1773 (D. Del.)) ("Q. Do you believe correctional officers have an obligation to decontaminate the people they OC-spray? A. I do not believe that.").

[23] *See* Taylor Tr. 113 ("[W]e have over a week on hands-on defensive tactics. I want to say at least a day of actual OC training, another week of firearms training. But we also have weeks on de-escalation tactics, on conflict resolution, on trauma-informed supervision, mental health first aid, first aid. All of that involves use of force."); *id.* at 114 ("Combined with use of force – OC specifically is probably like a day and a half.").

The OC training unit at the academy includes a presentation titled "OC Aerosols."[24] It instructs correction officers to spray OC from a distance of at least three feet, use one-to-two-second bursts, and pause and evaluate before spraying more.

The training presentation states that after using OC, the officer should "[s]tart decontamination process and have [the exposed person] seen by medical."[25] The presentation instructs officers to "completely" decontaminate exposed individuals.[26]

One of the slides in the presentation underscores the decontamination requirement with bolded, all-caps text and a red skull and crossbones.



---

[24] Dkt. 1 Ex. A at DOC_SCI_0041428. The Department is currently updating the training materials to reflect its new policy. *See* Dkt. 45 Ex. C ¶ 11.

[25] Dkt. 1 Ex. A at DOC_SCI_0041446.

[26] *Id.* at DOC_SCI_0041455.

The instructor's notes for the slide contain the following additional information:

> Remove contaminated individuals from the area
> Start communication
> Expose to fresh air
> Subject should sit still
> Use lots of water
> Do not allow the subject to rub their eyes
> Use of a wet paper towel followed by a dry paper towel has proven to be an effective way to remove spray from skin.
> This should be repeated numerous times.
> Contact lenses should not be removed by individuals
> EMS units should remove all contacts especially hard contacts
> Difficulty in removing the contact lenses may cause scratches to the eye
> Hard contacts should be cleaned thoroughly
> Soft contacts should be disposed of
> Usually individuals will recover within one hour, with eyes opening within 20-30 minutes.
> Any individuals not showing improvement should be monitored closely to ensure recovery and medical assistance should be sought after 1 hour.
> Any pre-existing medical conditions, such as asthma, respiratory, or eye injuries, should be determined before decontamination begins.

The notes direct the instructor to ensure trainees understand the decontamination guidelines. They also remind the instructor to administer a written test on the material.

During academy training, cadets are sprayed in the face with OC. Under the current training regimen, cadets complete a series of tasks after being sprayed that includes taking someone into custody, applying handcuffs, and working as a team. After twenty to thirty minutes, cadets can decontaminate by flushing with water or wiping off the OC. The training is designed to show cadets what the effects are, demonstrate that they can work through them, and give them confidence.[27]

The Commissioner went through academy training and was sprayed with OC. The academy had not yet introduced the post-spraying tasks. She described being

---

[27] *See* Taylor Tr. 95–96, 99–102.

15

sprayed as "very uncomfortable" but did not recall feeling pain.[28] She believed that

the maximum effects of OC last only fifteen to twenty minutes.[29] She argued that OC

is "not designed to cause harm," but "to help the Department of Correction and other

law enforcement agencies maintain safe communities, safe facilities, safe employees,

and help resolve either combative situations or situations, especially in a prison

setting, where an individual or a group of individuals are not following those

orders."[30] She resisted referring to OC weapons as a type of chemical weapon.[31] She

did not believe that correction officers have any obligation to decontaminate a

---

[28] *Id.* at 95 ("I don't recall being in pain. I do recall being uncomfortable.").

[29] *Id.* at 97.

[30] *Id.* at 94–95. That is true, but OC achieves those outcomes by causing short-term harm in the form of pain and other intense symptoms. That is what makes OC an effective non-kinetic weapon. Moreover, OC can cause long-term harm. As discussed previously, when administered at close range (less than three feet), it can physically penetrate eye and skin tissue through a process called hydraulic needling, causing corneal injury, embedded chemical residue, and other meaningful harms. Extended OC exposure, particularly at concentrated levels, can lead to eye, lung, and skin injuries.

[31] *Id.* at 94, 169. The law-enforcement sprays, grenades, and shells that the Department deploys are plainly weapons. The fact that they use OC does not defeat that characterization. Water is not itself a weapon, but when police or military forces deploy water cannons or high-pressure hoses to disperse protesters, they are using water as a weapon. The Commissioner stressed that OC "is an organic chemical," "a biodegradable chemical," and a "food grade chemical." *Id.* She noted that "[y]ou could literally spray it on a sandwich and eat the sandwich. That's how safe it is." *Id.* One could similarly observe that water is essential to life, yet people still drown.

prisoner exposed to OC.[32]

The academy's training program is well-intentioned and no doubt valuable in terms of giving recruits exposure to OC. On the whole, however, it seems likely to inure correction officers to the effects of OC and lead them to dismiss or discount the importance of decontamination. Having been sprayed in training, a correction officer could believe that OC is not so bad, not really painful, and that a prisoner should just suck it up and wait it out.[33]

The experience that correction officers have in training differs dramatically from that of prisoners suffering without decontamination. The recruits know the exposure exercise is coming and can prepare for it mentally. They know other recruits have gone through it and that success is a prerequisite to graduation. They experience the OC test outside, under the supervision of multiple instructors, and with other

---

[32] Dkt. 8 Ex. P at 175 (Commissioner's September 10, 2024 deposition in *Davis v. Neal*, No. 1:21-cv-1773 (D. Del.)) ("Q. Do you believe correctional officers have an obligation to decontaminate the people they OC-spray? A. I do not believe that."); *accord* Dkt. 48 Ex. E (affidavit of correction officer averring that his exposure during training caused only "eye irritation and tingling or burning of the skin" and that the symptoms "took approximately 10 to 20 minutes to subside"); *id.* Ex. H (same); *id.* Ex. I (same); *id.* Ex. O (same); *id.* Ex. Q (same); *id.* Ex. S (same); *id.* Ex. V (same); *id.* Ex. AA (same); *id.* Ex. CC (same); *id.* Ex. X (same but averring symptoms dissipated in 15 to 30 minutes); *id.* Ex. W (same but averring symptoms dissipated in 45 minutes); *id.* Ex. Z (same but averring symptoms dissipated in 20 to 45 minutes); *id.* Ex. T (same but not addressing time for symptoms to dissipate).

[33] *See* Taylor Tr. 100–01 (disagreeing with prisoners' testimony about extent of pain; reiterating that she found OC "uncomfortable" but not painful, and that her "face felt warm, kind of like maybe if you were in the sun for like a little bit too long").

members of their academy class.[34] The instructor administers a blast of OC under controlled conditions.[35] Recruits need not fear that they will be left unmonitored or ignored if they have a serious health issue. After completing the exercise, recruits receive prompt access to water and can decontaminate. The overall experience is not only educational but also a valuable confidence builder and team-bonding exercise.[36]

Contrast that with the prisoner experience. The OC blast is unexpected. As shown by the accounts in this case, correction officers deploy OC under stressful and uncertain conditions, resulting in high-volume exposures at close range, often in enclosed spaces. The prisoners have no control over the experience and are immediately cuffed. As again evidenced by the accounts in this case, prisoners are taken away and confined unattended, still cuffed, without meaningful access to

---

[34] *See id.* at 102–03 (testifying to the presence of two or three instructors and ten to twelve recruits). The Commissioner explained that she was part of a comparatively small class. Today, there are approximately 30 to 50 recruits in each class. *Id.* at 112.

[35] *See id.* at 98–99 ("So myself and my fellow classmates were instructed to line up, and one by one we step up and we get about maybe 2 to 3-second spray in the face.").

[36] *See id.* at 96 (describing the purpose of training as "to kind of show the individuals that are coming through the academy what the effects are and how they can work through that"; noting that "[a] lot of it is psychological"); *id.* at 99 (explaining that the purpose of the training is "to feel the effects of the substance and to learn how to [work] through it, to know how it impacts . . . the way you can think"). To the Commissioner's knowledge, no recruit has ever been unable to complete the academy training because of the OC requirement. *Id.* at 135–36. Her counsel elicited that testimony to suggest that OC exposure is not that bad, but it serves more persuasively to demonstrate the profound difference between the nature of OC exposure in academy training and the real-world experiences of prisoners.

water, for extended and uncertain periods of time. Those with asthma were not provided with access to their inhalers. They have no information about when they will be uncuffed, allowed to decontaminate, or taken to a medical facility. They have no confidence as to whether correction officers or anyone in the medical facility will help them. Correction officers did not facilitate decontamination for any of the prisoners in this case, whether by providing them with materials for self-decontamination or offering guidance. When the named plaintiffs in this lawsuit went to the medical facility, they received no assistance. Sometimes they eventually could access limited amounts of water, but they were not able to shower for at least a day, sometimes longer.[37]

The OC experience of prisoners and correction officers could not be more different. The prisoner experience is one of intense pain, isolation, threat, and prolonged fear and anxiety. The correction officer experience involves overcoming a challenge, shared comradery, overall safety, and increased confidence.

After joining the Department, correction officers must attend annual refresher training on various subjects, including OC use. There is no evidence indicating that the refresher training alters the impressions about OC from the academy experience.

---

[37] Debate exists over whether water mitigates or enhances OC symptoms. The answer seems dependent on volume. Law-enforcement-grade OC is oil-based, so it is not water soluble and is difficult to wash off. Limited amounts of water do not flush off the oil but rather reactivate it. *See id.* at 102–03 ("I think we think that [water] helps because it may feel cool, but I think it actually prolongs the effects."). Large volumes of water, such as a shower, flush the oil off the skin.

To the contrary, in their nigh identical affidavits, correction officers asserted that decontamination after OC use is unnecessary.[38]

## F.     OC Incidents Without Decontamination

The eight plaintiffs are currently incarcerated in Delaware. All experienced prolonged pain and suffering because of a lack of Secure Decontamination. Several spread the OC to sensitive areas of their bodies after being denied Pre-Strip-Search Decontamination.[39] Several have experienced long-term health effects due to extended OC exposure. Those effects include prolonged pain, impaired vision, and difficulty breathing. For two plaintiffs, after prolonged exposure, sweat and humidity reactivated the chemical agent, causing further pain.

Three plaintiffs and one non-plaintiff prisoner testified credibly during the preliminary injunction hearing about their experiences, including a lack of Secure Decontamination. The four prisoners also testified credibly about experiencing extreme and persistent pain because of a lack of Secure Decontamination. Video evidence of the prisoners' real-time physical reactions corroborated their testimony. Their accounts confirmed their sworn pleading-stage allegations, which this court

---

[38] *See supra* note 32.

[39] The strip search procedure includes having prisoners demonstrate that there is nothing in their mouths, which sometimes requires running their hands through their mouths. The procedure also includes handling their genitals and buttocks to ensure that they do not have contraband. Taylor Tr. 190 (agreeing with steps involved in the strip search procedure).

previously discussed.[40] The Commissioner's counsel did not examine any of the prisoners or call any live witnesses to contest their accounts.[41]

## G.     This Litigation

On May 7, 2026, the plaintiffs filed this putative class action on behalf of all incarcerated persons in Delaware, defined to include both prisoners and pretrial detainees. They sued Terra Taylor in her official capacity as the Commissioner. Taylor directs all Delaware prison operations, including supervising the use-of-force policy, correction officers' compliance training programs, and any measures to discipline correction officers.

The complaint's lone count asserts that the Department's use of OC on prisoners without decontamination constitutes "cruel punishment" that violates Article I, Section 11 of the Delaware Constitution. In its entirety, that section states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; and in the construction of jails a proper regard shall be had to

---

[40] *See Calm v. Taylor* (*Threshold Opinion*), — A.3d —, —, 2026 WL 2082677, at *5–6 (Del. Ch. July 17, 2026).

[41] The Commissioner did submit a bevy of lawyer-drafted affidavits from correction officers, and the plaintiffs submitted five lawyer-drafted affidavits from third-party prisoners. This court affords less weight to those "non-adversarial proffers." *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 819 (Del. Ch. 2011); *accord In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *19 (Del. Ch. May 22, 2000) (describing witness affidavits and explaining that the Court of Chancery will "ordinarily attach little if any weight to such inherently self-serving and non-adversarial proffers").

the health of prisoners."[42] The plaintiffs invoke the portion of the clause prohibiting "cruel punishments."

The plaintiffs seek only declaratory and injunctive relief, not money damages. They request a declaration that using OC without proper decontamination after a prisoner has become compliant and the area secured violates the Cruel Punishment Clause. They ask for preliminary and permanent injunctions that would enjoin the Department from using OC on prisoners until the Department implements an adequate decontamination policy.

The case proceeded on an expedited basis toward a hearing on the plaintiffs' application for a preliminary injunction.

## H.    The Decontamination Policy

A few weeks after the plaintiffs filed suit, the Department issued the Decontamination Policy, formally designated DOC Policy No. 8.30B.[43] The Decontamination Policy establishes an OC decontamination policy for correction officers to follow. The plaintiffs maintain that the Decontamination Policy is inadequate.

The Decontamination Policy defines decontamination as "the process of safely removing, neutralizing, or flushing OC from an individual's skin, eyes, and

---

[42] Del. Const. art. I, § 11.

[43] Dkt. 45 Ex. A.

22

environment."[44] Based on that definition, the Decontamination Policy does not require anyone to do or facilitate any decontaminating.

The document establishes the Department's overarching policy that "staff will provide appropriate response to any individual in the custody of Level V and IV who has been subject to the direct application of OC, when safe and practical."[45] That policy statement does not mention decontamination. It raises the question of what constitutes an "appropriate response."

The Decontamination Policy states that "[u]pon direct application of OC, when safe and practical DOC staff will" first "[p]rovide clear direction to the individual and encourage them to remain calm and cooperative."[46] Requiring staff to provide clear direction is helpful, but it is not decontamination as defined.

The Decontamination Policy next states that a correction officer must "[r]emove the individual from the contaminated area."[47] Requiring removal is also helpful, but it too is not decontamination as defined. Removing a non-compliant prisoner from the area where the incident occurred also seems to be a routine measure after using force, so this step has minimal significance, if any.

The Decontamination Policy next states that a correction officer must "[e]scort

---

[44] *Id.* at 1.

[45] *Id.*

[46] *Id.*

[47] *Id.*

the individual for evaluation by medical staff, additional decontamination deemed medically reasonable, and clearance for return to housing."[48] Once more, taking an individual for medical evaluation is helpful, but it is not decontamination as defined. In fact, the Decontamination Policy does not mandate that medical staff engage in decontamination. The evidence suggests that currently, medical staff does not engage in decontamination,[49] and the Commissioner admitted during deposition that the Decontamination Policy did not change any of the medical provider's scope of work.[50] The reference to "additional decontamination" is also misleading, since under the Decontamination Policy's steps, no decontamination has happened yet. Most significantly, a transfer to the medical facility appears to require that the prisoner undergo a strip search, and the Decontamination Policy says nothing about Pre-Strip-Search Decontamination.

As its fourth step, the Decontamination Policy states, "Provide a fresh change of clothes, if appropriate, upon completion of medical examination and clearance."[51] That step is also helpful, but also is not decontamination as defined. It merely results in the prisoner potentially putting a clean uniform on over already contaminated skin and hair. It also appears that during a transfer to the medical facility, a prisoner

---

[48] *Id.* at 2.

[49] *See supra* note 22.

[50] Taylor Dep. 66–67.

[51] Decontamination Policy at 2.

must change out of the contaminated uniform. Like the second step, the fourth step has minimal significance, if any.

As its final step, the Decontamination Policy states, "Confirm the individual has access to water in housing to wash face, eyes, and other exposed skin areas."[52] Providing water in housing is already required, so this step does not add anything. The policy does not address access to a shower, soap and water, or any substances or materials that might help remove or neutralize OC.[53]

The Decontamination Policy says nothing about facilitating the decontamination of any contaminated areas. If a prisoner was sprayed in his cell, he could be sent back to the same contaminated cell. The Decontamination Policy says nothing about providing a prisoner with clean bedclothes.

In three places, the Decontamination Policy limits itself expressly to direct applications of OC.[54] It does not apply to any indirect exposures to OC.[55]

As this analysis demonstrates, the Decontamination Policy does not require anyone to do anything that falls within the Decontamination Policy's own definition

---

[52] *Id.*

[53] The Commissioner testified that during her training, she was trained to ensure that a prisoner exposed to OC had access to "water and soap." Taylor Tr. 118.

[54] *See* Decontamination Policy at 1 (applying policy to "the direct application of OC"); *id.* (identifying procedures to be followed when an individual is "subjected to the direct application of OC"); *id.* (identifying actions Department staff will take "[u]pon direct application of OC").

[55] Taylor Tr. 186 (agreeing with this interpretation).

of decontamination. It also does not require anyone to do anything they were not already doing, with two exceptions. One is to mandate that staff tell the prisoner to be calm and compliant, something they doubtless would do anyway. The other is to require that a shift supervisor "ensure the decontamination has been completed" and document that fact "on the use of force review form."[56] If compliance with the Decontamination Policy is sufficient to "ensure the decontamination has been completed," then decontamination can be completed without anyone doing any decontaminating. And if the shift supervisor need only note the fact of completion, then there is no requirement to note what was actually done.

During her deposition, the Commissioner seemed to agree that the Decontamination Policy did not add anything. She testified that it merely formalized what she believed correction officers were already doing.[57] From that standpoint, the Decontamination Policy accomplished nothing.[58]

---

[56] Decontamination Policy at 2.

[57] Taylor Dep. 30–31 ("The steps and guidelines that have been included in 8.30B for decontamination recommendations and circumstances. Those processes have always been taught in our initial training and our refresher training. It has been part of our facility procedures. There just has not been a formalized policy on it."); *accord* Dkt. 48 Ex. E (affidavit of correction officer describing his pre-Decontamination Policy training in terms that track policy).

[58] *See* Taylor Dep. 31 (Commissioner testifying that she understood the Decontamination Policy to be the "written embodiment of what the DOC was already doing"); *id.* at 66 ("[A]s I explained earlier, we had already been following these processes. It was memorializing the processes into a formal policy, which is 8.30B."); *id.* at 92 (same). At trial, the Commissioner put more emphasis on the policy

If anything, the Decontamination Policy seems more concerned with stressing that correction officers do *not* have to engage in decontamination in the face of other priorities. The policy only calls for decontamination "when safe and practical."[59] It identifies procedures to be followed "upon the incident being contained, the individual being compliant, and when otherwise safe and practical under the circumstances."[60] It concludes by stressing that "[n]othing in this policy requires staff to take actions that would compromise safety, security, or immediate operational needs."[61] The Decontamination Policy thus only addresses Secure Decontamination, which is the subject of this case. Yet in substance, it does not require any Secure Decontamination.

The Decontamination Policy contrasts with the federal policy on the use of OC. In a two-paragraph section titled, "DECONTAMINATION," it states:

> In situations where the use of OC or chemical agents are utilized, decontamination of the inmate(s) and affected staff must be conducted without delay, upon the incident being contained, and regardless of the availability of Health Services staff. This process is to be documented on video unless exigent circumstances exist. Primary decontamination procedures include fresh air and rinsing with water focusing on affected areas with special attention to the face, eyes, nose, and mouth. Additionally, a change of clothing is required.
>
> During the medical assessment, Health Services staff must determine if the decontamination is adequate. The inmate shall be allowed to wash

---

language, but still seemed to view the policy as confirming existing practice rather than effectuating change. *See* Taylor Tr. 158–61.

[59] Decontamination Policy at 1.

[60] *Id.*

[61] *Id.* at 2.

areas affected by the agent with soap and water and may be assisted by Health Services staff as necessary. Normally, this is conducted in conjunction with the medical examination and must be documented on video.[62]

Unlike the Decontamination Policy, the federal policy requires Secure Decontamination "without delay . . . regardless of the availability of Health Services staff." It contemplates fresh air *and* rinsing with water with special attention to the face, eyes, nose, and mouth, and it mandates time for the prisoner to wash with soap and water. It also mandates that the medical provider assess whether decontamination is adequate and whether additional decontamination is warranted. It calls for decontamination "to be documented on video unless exigent circumstances exist." The Decontamination Policy does none of these things.

## I.    The Injunction Hearing

The court conducted a hearing on the plaintiffs' application on June 18, 2026. During the hearing, the Commissioner testified live and in person. Four witnesses testified live but remotely. The parties introduced depositions, affidavits, documents, photographs, and videos into evidence. The Commissioner introduced two written expert reports that made broad claims about the safety of OC and sought to displace the court's role as the trier of fact by commenting on the credibility of witnesses, including a report from one expert who purported to make findings of fact.[63] At trial,

---

[62] Dkt. 57 Ex. 3.

[63] Dkt. 48 Exs. B & G.

28

the court will be able to determine what weight to give the expert opinions. Regardless, they are not permitted to invade the province of the court.[64]

At the conclusion of the hearing, the parties presented argument.

On July 17, 2026, the court issued the Threshold Opinion. That decision held that the plaintiffs have standing to sue, that the dispute is ripe, and that a private right of action exists under the Cruel Punishment Clause to obtain injunctive or declaratory relief. This decision addresses the Commissioner's contention that the Decontamination Policy rendered this case moot and the plaintiffs' application for interim injunctive relief.

The parties raised each of the issues addressed in the Threshold Opinion and this decision, and the court does not believe that either addresses any issue *sua sponte*. Both decisions take on questions of first impression that have required writing on a blank (or nearly blank) slate, but that is different than addressing an issue *sua sponte*. Both decisions have also addressed issues at greater depth than the parties did, including by considering authorities the parties did not cite. That falls within a court's purview.[65]

---

[64] *See Wheat v. State*, 527 A.2d 269, 274 (Del. 1987) (reversing judgment where expert invaded province of fact-finder by commenting on witness credibility); *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 2022 WL 2902769, at *1 (Del. Ch. July 14, 2022) ("An expert cannot displace the court's role by offering conclusions of law or purporting to make specific factual findings. . . . An expert also cannot propose factual findings based on his personal view of the evidence.").

[65] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal

## II. MOOTNESS

The Commissioner contends that the adoption of the Decontamination Policy rendered this dispute moot. "Mootness arises when controversy between the parties no longer exists such that a court can no longer grant relief in the matter."[66] "[A] controversy that has become moot normally will be dismissed."[67] The Decontamination Policy did not render this case moot.

---

theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *see U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 445–47 (1993) (holding that the court of appeals properly ordered supplemental briefing on a legal issue that no party raised or took a position on; explaining that a "court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief" (quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990)); *see Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 88 & n.9 (1993) (addressing a legal question even where parties agreed on the answer). Foreclosing a court from considering authorities the parties did not raise would function as a binding stipulation regarding the governing law, which cannot bind a court. *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917) ("If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law."); *accord Bank of Or.*, 508 U.S. at 448 ("After giving the parties ample opportunity to address the issue, the Court of Appeals acted without any impropriety in refusing to accept what in effect was a stipulation on a question of law."); *Fisher v. First Stamford Bank & Tr. Co.*, 751 F.2d 519, 523 (2d Cir. 1984) ("Generally, a stipulation of fact that is fairly entered into is controlling on the parties and the court is bound to enforce it. But a court is not governed by a stipulation on a question of law." (citations omitted)).

[66] *Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959, 963 (Del. 2003).

[67] *Glazer v. Pasternak*, 693 A.2d 319, 320 (Del. 1997).

30

## A.      The Standard

The Delaware Supreme Court has summarized the standard for mootness as follows:

> [A] party seeking to employ the mootness doctrine, typically the defendant, bears the burden of establishing that the controversy has become moot. The mootness doctrine addresses cases where a controversy existed at the time the plaintiff commenced litigation but the controversy later dissolves. Where a defendant voluntarily discontinues their conduct in response to a complaint being filed, we apply the mootness doctrine. In those cases, voluntary cessation does not automatically deprive the court of jurisdiction to hear the case. Under the mootness standard, the defendant bears the "heavy" burden of proving the controversy has become moot.[68]

"'A dispute is moot only if a grant of relief cannot have any practical effect on the existing controversy,'" and "'a court should not dismiss claims unless it is certain they could have no practical effect on the parties if adjudicated.'"[69] Even when a case has been rendered moot, "a court will rule on mooted issues that involve 'matters of public importance' and 'situations that are capable of repetition but evade review.'"[70]

---

[68] *Emps. Ins. Co. of Wausau v. First State Orthopaedics, P.A.*, 312 A.3d 597, 608–09 (Del. 2024) (emphasis omitted) (footnotes omitted).

[69] *Cont'l Auto. Sys., Inc. v. Nokia Corp.*, 2023 WL 1370523, at *11 (Del. Ch. Jan. 31, 2023) (quoting *PPL Corp. v. Riverstone Hldgs. LLC*, 2020 WL 3422397, at *3 (Del. Ch. June 22, 2020)); *accord NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 435 (Del. Ch. 2007) ("[I]f the alleged injury still exists despite the occurrence of intervening events, a justiciable controversy remains, and the mootness doctrine will not operate to deprive a court of jurisdiction to hear the case.").

[70] *Gandhi-Kapoor v. Hone Cap. LLC*, 307 A.3d 328, 342 (Del. Ch. 2023) (quoting *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 823 n.5 (Del. 1997)), *aff'd sub nom. CSC Upshot Ventures I, L.P. v. Gandhi-Kapoor*, 326 A.3d 369 (Del. 2024).

**B. The Implications Of The Decontamination Policy**

The Decontamination Policy did not render this lawsuit moot. The plaintiffs seek both declaratory and injunctive relief. The Decontamination Policy does not moot either.

The plaintiffs seek a declaration that failing to facilitate Secure Decontamination violates the Cruel Punishment Clause. As part of that ruling, they seek a declaration that failing to facilitate Pre-Strip-Search Decontamination violates the Cruel Punishment Clause. The Decontamination Policy does not declare either true. Those issues remain live. The Decontamination Policy does not render the case moot as to declaratory relief.

The Decontamination Policy also does not render the dispute moot as to injunctive relief. The plaintiffs seek injunctive relief to compel the Department to comply with the Cruel Punishment Clause by facilitating Secure Decontamination, including Pre-Strip-Search Decontamination. The Decontamination Policy does not require either. It states as conditions for decontamination that a prisoner be "compliant" and that decontamination must be "otherwise safe and practical," but the Decontamination Policy does not require an officer to do anything more than tell a prisoner to calm down, take the prisoner to the medical facility, and confirm that the prisoner has access to potable water in their living area. Judged by the Decontamination Policy's own definition of decontamination, the Decontamination Policy does not require any. The Decontamination Policy also says nothing about Pre-Strip-Search Decontamination. After trial, the court can grant targeted, mandatory

injunctive relief requiring the facilitation of Secure Decontamination, including Pre-Strip-Search Decontamination, or imposing other requirements. Those issues remain live.[71]

The Commissioner's lawyers now argue that the Decontamination Policy "replaced [the Department]'s prior informal policy and practices under which any constitutional violations occurred," that the Decontamination Policy "expressly prohibits the challenged conduct," and that it has "addresse[d] every material concern identified in Plaintiffs' complaint."[72] For the reasons already discussed, that overstates matters factually.

Legally, those assertions do not fairly characterize the plaintiffs' complaint or their ongoing concerns. When the plaintiffs sued, the Department lacked any written policy on decontamination, leaving the matter to correction officers' discretion. If the plaintiffs only wanted the Department to adopt a written policy, then the

---

[71] Facilitating Secure Decontamination does not mean that correction officers must conduct the decontamination. *See* Hearing Tr. 229 (plaintiffs' counsel agreeing they are not seeking to have correction officers personally conduct the decontamination); *cf.* Taylor Tr. 120–21, 128–29 (explaining why it may be dangerous for correction officers to conduct the decontamination themselves). It merely contemplates that correction officers provide a prisoner with the opportunity for self-decontamination, supply the necessary resources (like a prompt shower), and give instructions on how to self-decontaminate. After all, correction officers are trained in those matters. *See* Taylor Tr. 114 (describing training in OC decontamination that recruits receive). Prisoners are not.

[72] Dkt. 48 at 2, 33, 41.

Decontamination Policy would render the dispute moot. But the plaintiffs did not seek just any decontamination policy. They seek a constitutionally adequate one.

The plaintiffs have pointed to gaps in the Decontamination Policy that could render it constitutionally inadequate. If the plaintiffs prevail at trial, the court could issue permanent injunctive relief addressing those gaps. For example:

- The Decontamination Policy requires Department staff to facilitate decontamination only of individuals "subjected to the direct application of OC."[73] The policy does not address indirect contamination or area contamination.

- The Decontamination Policy requires Department staff to facilitate decontamination "without delay," but emphasizes in three places when decontamination need not happen.[74] It does not explain when Secure Decontamination or Pre-Strip-Search Decontamination should happen. Under the federal decontamination policy, decontamination must be conducted without delay, upon the incident being contained.

- The Decontamination Policy punts any actual decontamination to the medical staff.[75] The federal decontamination policy calls for decontamination regardless of the availability of health services staff.

- The Decontamination Policy requires Department staff to "[c]onfirm the individual has access to water in housing."[76]

  o The policy does not specify the source or extent of the water. The Sabre Red product labels call for flushing with water. The federal decontamination policy calls for rinsing with water focusing on affected

---

[73] Decontamination Policy at 1.

[74] *See id.* at 1 ("when safe and practical"); *id.* ("upon the incident being contained, the individual being compliant, and when otherwise safe and practical under the circumstances"); *id.* at 2 ("[n]othing in this policy requires staff to take actions that would compromise safety, security, or immediate operational needs").

[75] *Id.* at 2.

[76] *Id.*

areas with special attention to the face, eyes, nose, and mouth and for allowing the prisoner to wash with soap and water.

- The policy does not call for facilitating access to a minimum-duration shower. The Sabre Red product labels establish minimum durations for flushing. The federal decontamination policy calls for rinsing with water.

- The policy does not address soap or other cleansing agents. The Sabre Red product labels recommend cleansing agents. The federal decontamination policy calls for allowing the prisoner to wash with soap and water.

- The Decontamination Policy requires Department staff to "[p]rovide a fresh change of clothes, if appropriate."[77] The policy does not address clean bedding.

- The Decontamination Policy requires Department staff to "[r]emove the individual from the contaminated area."[78] The policy does not address decontaminating a contaminated cell.

- The Decontamination Policy requires that a shift supervisor document the completion of decontamination "on the use of force review form,"[79] but does not specify any informational requirements. A supervisor could inferably comply by simply stating that decontamination was completed. The federal decontamination policy requires that the decontamination process be documented on video unless exigent circumstances exist.

By not addressing these issues, the Decontamination Policy leaves them to the correction officers' discretion. Although some level of officer discretion will be necessary for implementing any policy, the plaintiffs may prove at trial that one or more of these gaps, individually or collectively, render the decontamination

---

[77] *Id.*

[78] *Id.* at 1.

[79] *Id.* at 2.

constitutionally inadequate, allow violations of the Cruel Punishment Clause to continue, and warrant declaratory relief or a mandatory injunction.

The Commissioner's lawyers also argue that Delaware prisons "are now operating under a very different paradigm for decontamination—one that is less subject to overbroad interpretation or outright misinterpretation."[80] That is far from clear. The Commissioner seemed to agree during her deposition that the Decontamination Policy is the "written embodiment of what the [Department] was already doing."[81]

The Decontamination Policy is inferably an improvement. It is more definitive than the pre-litigation status quo of no written policy at all. It is also safe to infer that correction officers will strive to comply with it. But that does not render the case moot, either as to declaratory relief or post-trial injunctive relief.

The Commissioner has failed to show that the controversy has become moot. Dismissal on mootness grounds is not warranted.

## III. THE STANDARD FOR A PRELIMINARY INJUNCTION

The plaintiffs seek a preliminary injunction enjoining the Department from using OC pending the earlier of the adoption and implementation of a constitutionally adequate decontamination policy or a final adjudication on the merits.

> When seeking a preliminary injunction, a plaintiff must demonstrate a reasonable probability of success on the merits and that some

---

[80] Dkt. 48 at 40–41.

[81] *See* Taylor Dep. 31; *accord supra* notes 50, 57–58 and accompanying text.

irreparable harm will occur in the absence of the injunction. Furthermore, in evaluating the need for a preliminary injunction, the Court must balance the [moving party's] need for protection against any harm that can reasonably be expected to befall the [non-moving party] if the injunction is granted.[82]

The court need not weigh the elements equally, and a strong showing on one element can compensate for a weaker showing on another.[83]

## IV. A REASONABLE PROBABILITY OF SUCCESS ON THE MERITS

The first element of the test for a preliminary injunction requires that the plaintiff establish a reasonable probability of success on the merits.[84] "A party showing a reasonable probability of success must demonstrate that it will prove that it is more likely than not entitled to relief."[85] To prevail at trial, plaintiffs need only establish their claims by a preponderance of the evidence, which "means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that

---

[82] *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1278–79 (Del. 1989) (citation omitted).

[83] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998), *abrogated in part on other grounds by State v. Monsanto Co.*, 299 A.3d 372 (Del. 2023); *see also In re Est. of Wolhar*, 2018 WL 721417, at \*3 (Del. Ch. Feb. 6, 2018) (explaining that "[s]ome showing is required for each element").

[84] *See Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 602 (Del. Ch.), *aff'd*, 316 A.2d 619 (Del. 1974) (per curiam).

[85] *C & J Energy Servs., Inc. v. City of Mia. Gen. Emps.'*, 107 A.3d 1049, 1067 (Del. 2014) (internal quotation marks omitted).

something is more likely true than not."[86] Linking the standards together demonstrates that plaintiffs need not show at the preliminary injunction stage that they will prevail at trial. The resulting standard for a preliminary injunction "falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made."[87] That said, the burden is not a light one, and a preliminary injunction will never be granted unless earned.[88]

Under this standard, the plaintiffs have established a reasonable likelihood of success on the merits. They are reasonably likely to be able to show at trial that the failure to facilitate Secure Decontamination violates the Cruel Punishment Clause. They are reasonably likely to be able to show at trial that the failure to facilitate Pre-Strip-Search Decontamination violates the Cruel Punishment Clause.

## A. Is The Cruel Punishment Clause Co-Extensive With The Eighth Amendment?

Before applying a provision in the Delaware Constitution, a court must understand what it requires. When a provision in the Delaware Constitution closely resembles a provision in the federal constitution, the court must determine whether

---

[86] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (internal quotation marks omitted).

[87] *Cantor Fitzgerald, L.P.*, 724 A.2d at 579 (internal quotation marks omitted).

[88] *Buckeye P'rs, L.P. v. GT USA Wilm., LLC*, 2020 WL 2551916, at *5 (Del. Ch. May 20, 2020).

the Delaware provision has independent content. In this case, that means determining whether the Cruel Punishment Clause can operate independently of the Eighth Amendment as interpreted by the Supreme Court of the United States.

State courts use different models when analyzing the relationship between state and federal constitutional protections.[89] The state-primacy model treats a state's constitution as "an independent source of rights and relies on it as the [state's] fundamental law."[90] A state court starts with the state constitution and only applies the U.S. Constitution as a fallback. The interstitial model inverts the order of analysis. Analysis starts with the U.S. Constitution and only reaches the state constitution if the federal right leaves a gap.[91] The lockstep model goes further in prioritizing federal law. It assumes that "a state constitutional provision with an analogous federal counterpart should be construed precisely the same way."[92]

---

[89] *See* Randy J. Holland, *State Constitutions: Purpose and Function* [hereinafter *Purpose & Function*], *in The Delaware Constitution of 1897: The First One Hundred Years* 5, 18 (Randy J. Holland & Harvey Bernard Rubenstein eds., 1997) [hereinafter *First 100 Years*].

[90] *Id.* at 18 (quoting Robert F. Utter, *Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues When Disposing of Cases on State Constitutional Grounds*, 63 Tex. L. Rev. 1025, 1028 (1985)).

[91] *See id.*; *accord* Utter, *supra*, at 1028–29.

[92] Holland, *Purpose & Function*, *supra*, at 18.

The Commissioner argues that the court must interpret the Cruel Punishment Clause in lockstep with the Eighth Amendment.[93] The Delaware Supreme Court, however, has strongly indicated otherwise. In *Sanders*, a decision that implicated whether the Cruel Punishment Clause had the same meaning as the Eighth Amendment for purposes of reviewing the proportionality of a capital sentence, the Delaware Supreme Court described as "untenable" the argument "that our Constitution must mean exactly the same thing as the United States Constitution."[94] The decision noted that many of Delaware's constitutional provisions, including the Cruel Punishment Clause, "predate the United States Constitution itself."[95] The decision also observed that because the federal Bill of Rights did not apply to the states until after the adoption of the Fourteenth Amendment in 1868, "it must be conceded that state constitutional protections had significance prior to that point," and the justices saw no reason to think that the incorporation of the federal Bill of Rights against the states "abolished the independent force of state provisions that are similar to incorporated federal provisions."[96] The court also warned that "[i]f we were

---

[93] *See* Dkt. 48 at 2 ("Article I, Section 11 affords Plaintiffs no additional rights over Eighth Amendment jurisprudence"); *id.* at 35 ("Article I, Section 11 affords Plaintiffs no additional rights over the Eighth Amendment"); *id.* at 44 ("Article I, Section 11 affords Plaintiffs no additional rights versus the Eighth Amendment of the U.S. Constitution").

[94] *Sanders v. State*, 585 A.2d 117, 145 (Del. 1990).

[95] *Id.* at 145 n.24.

[96] *Id.*

to hold that our Constitution is simply a mirror image of the Federal Constitution, we would be relinquishing an important incident of this State's sovereignty. In a very real sense, Delaware would become less of a State than its sister States who recognize the independent significance of their Constitutions."[97] *Sanders* suggests that the Cruel Punishment Clause has independent content.

In a decision post-dating *Sanders*, the Delaware Supreme Court called for applying "a logical, deductive analytical process" when determining whether a provision in the Delaware Constitution should be given the same interpretation as "*similar* language in the United States Constitution."[98] Citing an influential concurring opinion by Justice Handler of the New Jersey Supreme Court in *State v. Hunt*,[99] the Delaware Supreme Court identified "non-exclusive criteria" that could frame the analysis.[100] In subsequent decisions, the Delaware Supreme Court has regularly stressed the need to address the *Hunt* factors and has held that parties waived arguments when they did not address them.[101] At this point, the *Hunt* factors

---

[97] *Id.* at 145–46.

[98] *Jones v. State*, 745 A.2d 856, 864 (Del. 1999).

[99] *State v. Hunt*, 450 A.2d 952, 962–69 (N.J. 1982) (Handler, J., concurring).

[100] *Jones*, 745 A.2d at 864.

[101] *E.g.*, *Lloyd v. State*, 292 A.3d 100, 110 n.48 (Del. 2023) (calling for analysis of same factors identified in *Hunt*); *Burrell v. State*, 207 A.3d 137, 143 (Del. 2019) (same); *Monroe v. State*, 9 A.3d 476, 2010 WL 5050863, at *2 (Del. 2010) (TABLE) (citing *Hunt* factors as adopted in *Jones*); *Jenkins v. State*, 970 A.2d 154, 158 (Del.

have emerged as the presumptive framework for determining whether a provision in

the Delaware Constitution carries independent content.

The *Hunt* factors include:

(1) Textual Language—A state constitution's language may itself provide a basis for reaching a result different from that which could be obtained under federal law. Textual language can be relevant in either of two contexts. First, distinctive provisions of our State charter may recognize rights not identified in the federal constitution. . . .

Second, the phrasing of a particular provision in our charter may be so significantly different from the language used to address the same subject in the federal Constitution that we can feel free to interpret our provision on an independent basis . . . .

(2) Legislative History—Whether or not the textual language of a given provision is different from that found in the federal Constitution, legislative history may reveal an intention that will support reading the provision independently of federal law. . . .

(3) Preexisting State Law—Previously established bodies of state law may also suggest distinctive state constitutional rights. State law is often responsive to concerns long before they are addressed by constitutional claims. Such preexisting law can help to define the scope of the constitutional right later established.

(4) Structural Differences—Differences in structure between the federal and state constitutions might also provide a basis for rejecting the constraints of federal doctrine at the state level. The United States Constitution is a grant of enumerated powers to the federal government. Our State Constitution, on the other hand, serves only to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives. Hence, the explicit affirmation of fundamental rights in our Constitution can be seen as a guarantee of those rights and not as a restriction upon them.

(5) Matters of Particular State Interest or Local Concern—A state constitution may also be employed to address matters of peculiar state

2009) (same); *Wallace v. State*, 956 A.2d 630, 637–38 (Del. 2008) (same); *Ortiz v. State*, 869 A.2d 285, 290–91 & n.4 (Del. 2005) (same).

42

interest or local concern. When particular questions are local in character and do not appear to require a uniform national policy, they are ripe for decision under state law. Moreover, some matters are uniquely appropriate for independent state action. . . .

(6) State Traditions—A state's history and traditions may also provide a basis for the independent application of its constitution . . . .

(7) Public Attitudes—Distinctive attitudes of a state's citizenry may also furnish grounds to expand constitutional rights under state charters. While we have never cited this criterion in our decisions, courts in other jurisdictions have pointed to public attitudes as a relevant factor in their deliberations.[102]

These factors "share a common thread—that distinctive and identifiable attributes of a state government, its laws and its people justify recourse to the state constitution as an independent source for recognizing and protecting individual rights."[103]

Delaware precedent suggests a need to address independent content on an issue-by-issue basis.[104] In this case, the Commissioner relies on federal law that

---

[102] *Jones*, 745 A.2d at 864–65 (formatting and alterations in original) (quoting *Hunt*, 450 A.2d at 965–66 (Handler, J., concurring)); *see Doe v. Wilm. Hous. Auth.*, 88 A.3d 654, 662–63 (Del. 2014) (same).

[103] *Jones*, 745 A.2d at 865 (internal quotation marks omitted).

[104] The pattern of the Delaware Supreme Court's rulings suggests an issue-specific approach. On many occasions, the Delaware Supreme Court has held that the Delaware Constitution carries independent meaning. *See infra* note 324 (collecting cases). On other occasions, however, it has not. *See Gen. Elec. Co. v. Klein*, 106 A.2d 206, 210 (Del. 1954) (interpreting language in Article I, Section 7 of the Delaware Constitution in parallel with the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution); *Whitwell v. Archmere Acad., Inc.*, 2008 WL 1735370, at *2 (Del. Super. Apr. 16, 2008) (observing that when evaluating a claim for deprivation of a right without due process of law, Delaware follows the lockstep approach); *Bailey v. City of Wilmington*, 1999 WL 1442006, at *3 (Del. Super. Dec. 22, 1999) (same)*, aff'd*, 766 A.2d 477 (Del. 2001) (per curiam). *See generally Sheehan v.*

requires prisoners to show that any correction officers directly involved in an incident "were deliberately indifferent to their serious medicals [sic] needs."[105] The Commissioner also relies on federal precedent that requires prisoners to show that any supervisor not directly involved in the incident was aware of a widespread practice and deliberately indifferent to its continuation.[106] In other words, the Commissioner argues that the Cruel Punishment Clause requires that the correction officers and supervisors have acted with cruel intent.

The *Hunt* factors call for considering many issues, so buckle up for a hard slog. Taken as a whole, the *Hunt* factors counsel against interpreting the Cruel Punishment Clause in lockstep with federal Eighth Amendment decisions requiring cruel intent. The Cruel Punishment Clause protects against cruel effects. It does not also require a showing of cruel intent.

---

*Oblates of St. Francis de Sales*, 15 A.3d 1247, 1259 (Del. 2011) ("Delaware constitutional due process is coextensive with federal due process.").

[105] Dkt. 48 at 2; *accord id.* at 35 ("Plaintiffs offer no evidence correctional officers were deliberately indifferent to inmates' serious medicals needs to establish a constitutional violation"); *id.* at 44 ("there is no evidence correctional officers were deliberately indifferent to Plaintiffs' serious medical needs or violated their constitutional rights").

[106] *See id.* at 2–3 ("even if Plaintiffs could show individual constitutional violation(s), there is no evidence DOC has a widespread non-decontamination practice or was otherwise deliberately indifferent, as an agency, to inmate non-decontamination"); *id.* at 35 ("there is no evidence DOC has a widespread non-decontamination practice or was deliberately indifferent to inmate non-decontamination"); *id.* at 44–45 ("even if individual officers violated Plaintiffs' constitutional rights, there is no evidence DOC engaged in a widespread non-decontamination practice and was deliberately indifferent in doing so").

1.      **Text**

Under the first *Hunt* factor, "[a] state constitution's language may itself provide a basis for reaching a result different from that which could be obtained under federal law."[107] Put differently, "the phrasing of a particular provision in [Delaware's] charter may be so significantly different from the language used to address the same subject in the federal Constitution that we can feel free to interpret our provision on an independent basis."[108] Here, the question is whether the Cruel Punishment Clause requires not only a cruel effect, but also cruel intent, evidenced by deliberate indifference to a serious medical need.

There are obvious textual differences between the Cruel Punishment Clause and the Eighth Amendment. The following table presents the text of the two provisions side by side, with unique text in italics.

| Cruel Punishment Clause | Eighth Amendment |
|---|---|
| Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; *and in the construction of jails a proper regard shall be had to the health of prisoners.* | Excessive bail shall not be required, nor excessive fines imposed, nor cruel *and unusual* punishments inflicted. |

Two differences jump out. First, the Cruel Punishment Clause prohibits "cruel punishments," while the Eighth Amendment prohibits "cruel and unusual punishments." Second, the Cruel Punishment Clause appears in a provision that

---

[107] *Jones*, 745 A.2d at 864.

[108] *Doe*, 88 A.3d at 662.

appends a requirement that "in the construction of jails a proper regard shall be had to the health of prisoners" (the "Prisoner Health Clause").

The shared text in the two clauses provides a strong indication that the meaning of the word "cruel" does not require cruel intent. The canon of *noscitur a sociis* directs that the meanings of words, especially in a list, should be consistent with the context that the surrounding words provide.[109] In both, the cruel punishment clause follows two others, one prohibiting excessive bail and the other prohibiting excessive fines.

That sequence has two implications. First, whether bail or a fine is excessive requires an assessment of proportionality.[110] Bail or a fine becomes excessive relative to a particular violation or an individual's ability to pay. Second, whether bail or a fine is excessive does not turn on the intent of the person imposing it. The inquiry turns on the effects. Under the canon of *noscitur a sociis*, therefore, a cruel

---

[109] *E.g.*, *Del. Bd. of Nursing v. Gillespie*, 41 A.3d 423, 427 (Del. 2012) ("*Noscitur a sociis* provides that 'words grouped in a list should be given related meaning.'" (quoting *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990)); *Zimmerman v. Crothall*, 2012 WL 707238, at *7 (Del. Ch. Mar. 27, 2012) (describing the canon as calling for words to be "interpreted in the context of the words surrounding them" (citing *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000))).

[110] *See United States v. Bajakajian*, 524 U.S. 321, 334 (1998) ("The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish. . . . [A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."); *Benton v. State*, 711 A.2d 792, 799 (Del. 1998) (applying *Bajakajian*).

punishment has effects disproportionate to the seriousness of the offense or the purpose of the punishment. Intent does not matter.[111]

The Delaware Supreme Court often looks to dictionaries for assistance in determining plain meaning.[112] The most prominent Founding Era dictionary was Samuel Johnson's *Dictionary of the English Language*, published in 1755. It defined "cruel" in two ways. The first applied to persons and read: "Pleased with hurting others; inhuman; hard-hearted; without pity; without compassion; savage; barbarous; unrelenting." The second was marked "Of things" and read: "Bloody; mischievous; destructive; causing pain."[113] Noah Webster lived during the Founding Era and published the first edition of his famous dictionary in 1828. It similarly offered two

---

[111] For purposes of imposing monetary liability on an individual because of a constitutional violation, the actor's mental state could matter. This case does not seek to impose money damages on individual defendants, and it remains an open question whether Delaware would recognize a private right of action for money damages for violations of the Cruel Punishment Clause. *See Threshold Op.*, 2026 WL 2082677, at *16–17.

[112] *E.g.*, *Cephas v. State*, 911 A.2d 799, 801 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms." (internal quotation marks and citation omitted)); *Andrews v. State*, 34 A.3d 1061, 1063 (Del. 2011) (explaining that when a statute fails to define a term, it "must be given its common, or dictionary, definition"); *Freeman v. X-Ray Assocs., P.A.*, 3 A.3d 224, 227–28 (Del. 2010) ("Because dictionaries are routine reference sources that reasonable persons use to determine the ordinary meaning of words, we often rely on them for assistance in determining the plain meaning of undefined terms." (citations omitted)).

[113] John F. Stinneford, *The Original Meaning of "Cruel"*, 105 Geo. L.J. 441, 467 (2017) (*quoting* 1 Samuel Johnson, *A Dictionary of the English Language* (London, W. Strahan 1755)).

definitions, one dealing with human behavior and focusing on cruel intent, and another dealing with things and focusing on cruel effects.[114] Those definitions support the cruel-effect reading, because the Cruel Punishment Clause never mentions a punisher. It only addresses a thing (cruel punishment). "Things do not have intent."[115]

The absence of the words that the Cruel Punishment Clause lacks—"and unusual"—is ambiguous. The term "unusual" could mean novel compared to past practice, or it could mean uncommon in the sense of rare. Legislative history, discussed below, reveals that "unusual" was a common-law term of art meaning contrary to the long-established custom and usage that the common law enforced. The term thus suggests a means of determining what is cruel: One compares the punishment to long-established custom and usage.[116]

Omitting the words "and unusual" is similarly ambiguous. To the extent a court could consider multiple sources when assessing whether a punishment is

---

[114] *Id.* (discussing 1 Noah Webster, *An American Dictionary of the English Language* (New York, S. Converse 1828)).

[115] *Id.* at 468. As discussed below, Justice Thomas has cited both dictionaries as evidence that during the Founding Era, the term "cruel" referred to a public official's cruel intent. *See Baze v. Rees*, 553 U.S. 35, 97 (2008) (Thomas, J., concurring). But Justice Thomas only cited the first definition in each dictionary. He failed to acknowledge that both dictionaries contained a second definition that was more pertinent to the issue of punishment. *See* Stinneford, *Cruel*, *supra*, at 467 (discussing *Baze*).

[116] *See infra* Section IV.A.2.

"cruel," omitting the limiting language suggests an intent to permit inquiry beyond a comparison with longstanding custom. But to the extent "cruel" was already understood to require comparing the punishment to long-established custom, then omitting the term might simply have gotten rid of a superfluous word.

As discussed below, the legislative history again elucidates. Recent research into the history of Pennsylvania's comparable provision shows that the omission was an intentional reflection of Pennsylvania's leadership in the area of sentencing and prison reform. Thomas McKean and John Dickinson, close friends and both major figures in Delaware's constitutional evolution, were part of the reform movement. McKean participated in drafting Pennsylvania's provision in 1789 and 1790, shortly before Dickinson led Delaware's emulation of it in 1791 and 1792.

Interpreting the omission of "and unusual" as opening the door to a broader inquiry than comparing the punishment to longstanding custom finds support in the Prisoner Health Clause, language completely absent from the Eighth Amendment. The presence of the Prisoner Health Clause and its appearance immediately after the Cruel Punishment Clause point to a unique concern for the health of prisoners. Nominally, of course, the Prisoner Health Clause only applies to the construction of jails, but it would be counterintuitive to think that the concern did not encompass the conditions of confinement. After all, the reason to focus on the health of prisoners when constructing jails is not because of something unique to the construction process. The mandate exists because the construction affects the conditions of confinement.

The presence of the Prisoner Health Clause also reinforces the inference that the plain language of the Cruel Punishment Clause focuses on cruel effects, not cruel intent. Under standard principles of interpretation, the omission of a word or concept from one provision contrasted with its inclusion in another suggests a difference in meaning.[117] The Prisoner Health Clause contemplates a mental state, i.e. "a proper regard shall be had to the health of prisoners" when constructing jails. That means the designers and builders of jails should consider the implications of their work on the health of prisoners. No similar language modifies the excessive bail, excessive fines, or cruel punishment clauses.

The text of the Cruel Punishment Clause and Article I, Section 11 as a whole thus points to the provision having different meaning than the Eighth Amendment— or at least different than how the Supreme Court of the United States has interpreted it. Other courts have similarly given effect to textual distinctions when holding that

---

[117] *See, e.g.*, *City of Lewes v. Nepa*, 212 A.3d 270, 279 & n.37 (Del. 2019) (reasoning that where a term is used in one portion of a writing, but omitted from another portion, that is a "meaningful variation" suggesting the drafters intended a different outcome); *Fuller v. State*, 104 A.3d 817, 822 (Del. 2014) (reasoning that where the General Assembly removes certain words from a statute and then inserts different words in their place, the resulting meaning is presumptively intentional); *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982) ("[W]here a provision is expressly included in one section of a statute, but is omitted from another, it is reasonable to assume that the Legislature was aware of the omission and intended it."); *C & T Assocs. v. New Castle*, 408 A.2d 27, 29 (Del. Ch. 1979) ("The legislative body is presumed to have inserted every provision for some useful purpose and construction, and when different terms are used in various parts of a statute, it is reasonable to assume that a distinction between the terms was intended.").

state prohibitions on cruel punishment differed from the Eighth Amendment.[118] The text of the Cruel Punishment Clause points to a "cruel punishment" being one that has disproportionate effect, without requiring a showing of cruel intent.

---

[118] *See Commonwealth v. Lee*, 357 A.3d 356, 380 (Pa. 2026) (holding that Pennsylvania's cruel punishment clause is broader than the Eighth Amendment in part because "the cruel punishments provision in the Pennsylvania Constitution . . . does not use the term 'unusual'"); *In re Williams*, 496 P.3d 289, 297 (Wash. 2021) (interpreting Washington's cruel punishment clause; treating omission of "and unusual" as "material and support[ing] a more expansive interpretation" than the Eighth Amendment); *State v. Moeller*, 548 N.W.2d 465, 487 (S.D. 1996) (explaining that the state constitution's prohibition of "cruel punishment" could provide greater protection than the Eighth Amendment); *People v. Baker*, 229 Cal. Rptr. 3d 431, 442 (Cal. Ct. App. 2018) (reasoning that California's use of the disjunctive "cruel or unusual" is "'purposeful and substantive'" and warrants a broader interpretation than the Eighth Amendment (quoting *People v. Carmony*, 26 Cal. Rptr. 3d 365, 378 (Cal. Ct. App. 2005)); *People v. Bullock*, 485 N.W.2d 866, 872 & n.11 (Mich. 1992) (noting that Michigan's constitution prohibits "cruel or unusual" punishment and observing that "[t]he set of punishments which are *either* 'cruel' *or* 'unusual' would seem necessarily broader than the set of punishments which are *both* 'cruel' *and* 'unusual'" (emphases in original)); *People v. Benton*, 817 N.W.2d 599, 607–08 (Mich. Ct. App. 2011) (holding that disjunctive state provision warranted broader interpretation than Eighth Amendment); *State v. Ali*, 855 N.W.2d 235, 258 (Minn. 2014) (same); *cf.* William W. Berry, III, *Cruel State Punishments*, 98 N.C. L. Rev. 1201, 1206, 1245–49 (2020) (arguing that different linguistic formulations of "cruel and unusual punishment," "cruel or unusual punishment," and "cruel punishment" should lead to different interpretive results, but finding that the majority of states follow Eighth Amendment caselaw regardless of the state provision's language); Meghan J. Ryan, *Does the Eighth Amendment Punishments Clause Prohibit Only Punishments That Are Both Cruel* And *Unusual?*, 87 Wash. U. L. Rev. 567, 605–10 (2010) (arguing that the use of "and" as opposed to "or" in the Eighth Amendment is significant and pointing to different formulations in state constitutions). Some scholars, however, have discounted the linguistic difference. *See* Gregory Velloze, *'Cruel and Unusual' in 1689, 1781, and 1868: Shifts in Incorporation*, 52 U.C. L. Const. Q. 27, 37–38 (2025) (citing examples); Tom Stacy, *Cleaning Up the Eighth Amendment Mess,* 14 Wm. & Mary Bill Rts. J. 475, 502–07 (2005) (arguing that the founders understood the phrases "cruel and unusual" and "cruel or unusual" to capture the same meaning).

## 2. Legislative History

The second *Hunt* factor calls on the court to examine legislative history. The legislative history of the Cruel Punishment Clause is largely coterminous with the development of the Delaware Constitution. That history calls for giving the provision meaning independent of the Eighth Amendment and how the Supreme Court of the United States has interpreted it. It supports reading the Cruel Punishment Clause as turning on cruel effect, not cruel intent.

Delaware has had four constitutions, adopted respectively in 1776, 1792, 1831, and 1897. The last continues in force today. They are not separate and independent, but linked. After the adoption of the first constitution in 1776, "[e]ach subsequent Delaware constitution has provided for a revision of the existing government rather than making a fundamental change."[119]

### a. The English Bill Of Rights

The history of the Cruel Punishment Clause begins in English law. "[M]uch of English constitutional history can be seen as a struggle between a power holder (whether it be king, judge, or Parliament) seeking to exercise unconstrained power to punish and others seeking to enforce common law limits on this power."[120]

---

[119] Maurice A. Hartnett, III, *Delaware's Charters and Prior Constitutions, in First 100 Years, supra*, at 23, 23 [hereinafter *Delaware's Charters*].

[120] John F. Stinneford, *Is Solitary Confinement A Punishment?*, 115 Nw. U. L. Rev. 9, 24 (2020).

The phrase "cruell and unusuall punishments" first came to prominence in the 1689 English Bill of Rights.[121] That clause served as the model for the similar provision in the 1776 Virginia Declaration of Rights.[122] The Virginia provision in turn served as a model for the 1776 Delaware Declaration of Rights, but with Delaware using the disjunctive phrase "cruel *or* unusual."[123] When Delaware adopted a new constitution in 1792, the drafters modeled a new Declaration of Rights on Pennsylvania's Constitution of 1790.[124] In doing so, they changed the language, dropped "or unusual," banned only "cruel punishments," and added the Prisoner Health Clause. That language remains unchanged in the current Delaware

---

[121] Stinneford, *Cruel, supra*, at 474; John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation,* 102 Nw. U. L. Rev. 1739, 1748 (2008). One scholar has traced the origin of the phrase to earlier historical events and literary sources. *See* John D. Bessler, *Lost and Found: The Forgotten Origins of the "Cruel and Unusual Punishments" Prohibition*, 14 Brit. J. Am. Legal Stud. 213 (2025). In an early and influential article, Anthony Granucci described the "final phraseology" of the English Declaration of Rights as nothing more than "chance and sloppy draftsmanship." Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning,* 57 Calif. L. Rev. 839, 855 (1969). Contemporary scholarship has largely repudiated that assessment. *See* Bessler, *supra*, at 236 ("This Article shows that the choice of the 'cruel and unusual punishments' language in the English Bill of Rights was neither inadvertent nor the product of chance or sloppy drafting.").

[122] Stinneford, *Cruel, supra*, at 465–66; Alexander A. Reinert, *Eighth Amendment Gaps: Can Conditions of Confinement Litigation Benefit From Proportionality Theory?*, 36 Fordham Urb. L.J. 53, 56 (2009).

[123] Randy J. Holland, *The Delaware State Constitution* 31 (2011) [hereinafter *Delaware State Constitution*].

[124] *Id.* at 32, 34.

Constitution of 1897. Thus, although the Cruel Punishment Clause ended up in a different place, the English Bill of Rights stands as its direct progenitor.[125]

The English Bill of Rights codified the principles announced in the 1688 Declaration of Rights, which accused King James II of imposing "excessive bail," "excessive fines," and "illegall and cruell punishments."[126] In the English Bill of Rights, "illegall" was changed to "unusuall."[127] The clause responded to punishments imposed by Lord Chief Justice George Jeffreys and other royal judges during the reign of James II, including during the "Bloody Assizes" and in the case of Titus Oates.[128]

The *Oates* case offers particular insight because the same Parliament that enacted the English Bill of Rights debated what constituted cruel and unusual punishment the following year. During the reign of James II, Oates had been convicted of perjury for falsely claiming that there was a plot to kill the King. His story was exposed as false, but only after most of the alleged members had been tried

---

[125] *Sanders*, 585 A.2d at 144 ("Together with the Eighth Amendment, Article I, Section 11 traces its heritage to the English Bill of Rights of 1689."). *See generally* John D. Bessler, *A Century in the Making: The Glorious Revolution, The American Revolution, and the Origins of the U.S. Constitution's Eighth Amendment*, 27 Wm. & Mary Bill Rts. J. 989 (2019).

[126] Stinneford, *Unusual, supra*, at 1760.

[127] *Id.*

[128] Stinneford, *Cruel, supra*, at 475; Velloze, *supra*, at 36; Akhil R. Amar, *The Bill of Rights: Creation and Reconstruction* 279 (1998). Granucci disputes that the "Bloody Assizes" played a role in generating the clause. Granucci, *supra*, at 856.

and executed.[129] Morally, Oates had contributed to several deaths, but legally, he was only convicted of perjury, a misdemeanor. At his sentencing, Lord Chief Justice Jeffreys expressed regret that the law did not authorize execution, then asked Justice Withins to pronounce the sentence. Withins sentenced Oates to be dragged across the City of London while being whipped "from Aldgate to Newgate," then two days later "from Newgate to Tyburn," to pay a fine of 2,000 marks, to suffer life imprisonment, to be pilloried four times a year, and to the loss of his clerical status.[130]

Oates somehow survived the dragging and whipping. After the passage of the English Bill of Rights, he petitioned Parliament to suspend his sentence as cruel and unusual. Some members of Parliament criticized the punishments for being too harsh for the crime of perjury compared to longstanding prior practice, with speakers noting that there was "no precedent" for them, that they were "of ill [e]xample, and unusual," and, if left in place, they would serve as precedent going forward.[131] Other members of Parliament stressed the Crown's lack of authority to defrock a priest, rendering that punishment beyond the law.[132] According to the debates, virtually every member of Parliament agreed with setting aside the sentence, and some members of the House

---

[129] Stinneford, *Cruel*, *supra*, at 475.

[130] *Id.* at 475–76.

[131] *Id.* at 476 (alteration in original).

[132] Stinneford, *Unusual*, *supra*, at 1761 n.128.

of Commons asserted that they had Oates's case in mind when they drafted what became the English Bill of Rights.[133]

Under the English Bill of Rights, "unusuall" was perhaps a more important term than "cruell" because it had meaning as a term of art under the common law. The common law was the most important source of law in seventeenth- and eighteenth-century England and eighteenth-century America.[134] Today, many lawyers think of common law as judge-made law, but the legally trained then understood it as the law of long-established custom and practice.[135]

A custom or practice could become binding under the common law if it was used throughout the jurisdiction for a long time, even without an implementing statute or royal decree. According to Edward Coke's *Institutes*, "no custome is to bee allowed, but such custome as hath bin used by title of prescription, that is to say, from time out of minde."[136]

---

[133] Stinneford, *Cruel, supra*, at 476.

[134] *Id.* at 469; Stinneford, *Unusual, supra*, at 1745, 1768.

[135] Stinneford, *Unusual, supra*, at 1768–69.

[136] 1 Edward Coke, *Institutes Of The Lawes Of England* (1628), *reprinted in* 2 *The Selected Writings And Speeches Of Sir Edward Coke* 577, 701 (Steve Sheppard ed., 2003). Coke attributed the quotation itself to Sir Thomas Littleton, adopted it, and commented on it. Coke has been described as the most important common-law jurist in English history, with one scholar proclaiming, "Coke's works have been to the common law what Shakespeare has been to literature, and the King James Bible to religion." Allen D. Boyer, *Introduction* to *Law, Liberty and Parliament: Selected Essays on the Writings of Sir Edward Coke* xiii–xiv (Allen D. Boyer ed., 2004) (citing legal historian William Holdsworth). Coke also influenced American legal thought in

William Blackstone agreed. He wrote that "in our law the goodness of a custom depends upon its having been used time out of mind; or, in the solemnity of our legal phrase, time whereof the memory of man runneth not to the contrary,"[137] and he called customary rules *leges non scriptæ*—the unwritten law.[138]

Blackstone believed that the English Bill of Rights limited the size of fines and the length of prison sentences, regardless of the intent in imposing them.[139] He similarly viewed the concept of cruel punishment as incorporating a dimension of proportionality and turning on cruel effect, not cruel intent.[140] For example, he criticized the "excessive severity" of the "Bloody Code," under which Parliament vastly expanded the list of capital offenses.[141]

Blackstone's influence in colonial and revolutionary America was pervasive.[142] That was particularly so in Delaware, because John Dickinson trained as a lawyer at the Middle Temple in London and was a contemporary of Blackstone. Thomas

the late eighteenth century to a degree comparable to Blackstone, himself a student of Coke. *See* Stinneford, *Unusual*, *supra*, at 1772.

[137] 1 William Blackstone, *Commentaries* \*67.

[138] *Id.* at \*64.

[139] *See* Stinneford, *Cruel*, *supra*, at 477–78.

[140] *Id.* at 476–78.

[141] *Id.* at 477.

[142] Eric Stockdale & Randy J. Holland, *Middle Temple Lawyers and the American Revolution* 15, 17 (2007).

McKean practiced with Dickinson and was admitted to the Middle Temple as a student member, although he never went to London.[143]

Under the established common-law view, long usage evidenced that a practice was just, reasonable, and enjoyed the consent of the people.[144] As a result, long-established custom provided both the primary source of positive law in the seventeenth and eighteenth centuries and the basis for individual rights assertable against the state.[145] An "unusual" practice, by contrast, conflicted with rights established through long usage.[146] A practice could be unusual if it was new or foreign to the jurisdiction. A practice also could be unusual if it revived an earlier practice that had "fall[en] completely out of usage for a long period of time."[147]

Under English common law, therefore, a punishment violated the common law if it was cruel in the sense of excessive and unusual in the sense of novel.[148] A cruel

---

[143] *See id.* at 10–11, 68, 132–33.

[144] Stinneford, *Unusual*, *supra*, at 1769–93 (surveying views of Coke, Blackstone, and other authorities).

[145] *Id.* at 1770.

[146] *Id.* at 1770–71.

[147] *Id.* at 1770–71, 1814; *see id.* at 1788–93 (discussing pre-Revolutionary writings objecting to English acts).

[148] Velloze, *supra*, at 38; Stinneford, *Cruel, supra*, at 474–76; Stinneford, *Unusual, supra*, at 1761.

and unusual punishment was one of "unprecedented harshness."[149] The analysis did not require cruel intent.[150]

### b. The Delaware Constitution Of 1776

During the eighteenth century, the American colonies adopted the common law and drew on it as a source of fundamental liberties and rights against the state.[151] "When the Revolution came on, the legal atmosphere of every community was permeated with the principles and the methods of the Common Law."[152] The American colonists saw themselves as fighting to preserve the legal traditions of English law and throw off the novel laws that Parliament had enacted to deprive the colonists of their rights.[153]

In the years leading up to the Declaration of Independence, American colonists drew on common-law principles to resist Parliament. "Americans repeatedly condemned Parliament's actions during this time period as 'innovations' and 'usurpations' that were 'unusual,' 'unconstitutional,' and 'void' because they were

---

[149] Stinneford, *Cruel*, *supra*, at 475–76; *accord* John F. Stinneford, *Experimental Punishments*, 95 Notre Dame L. Rev. 39, 48–55 (2019) (summarizing and synthesizing prior work on the original meaning of "cruel and unusual").

[150] Stinneford, *Cruel*, *supra*, at 476.

[151] Stinneford, *Unusual*, *supra*, at 1793–94.

[152] Stockdale & Holland, *supra*, at 15 (quoting Chief Justice Taft).

[153] Stinneford, *Unusual*, *supra*, at 1793–94.

contrary to 'common right or reason.'"[154] John Dickinson wrote in 1767 that Parliament's claim of power to tax the colonies was "an innovation; and a most dangerous innovation."[155] In 1769, when the British Parliament sought to revive a long-abandoned statute that would violate the traditional right to a local trial in the vicinity of the offense by authorizing the taking of American protesters to England for trial, the Virginia House of Burgesses described it as "new, unusual, . . . unconstitutional and illegal."[156]

In May 1776, the Continental Congress advised the colonies to form new governments.[157] The general sovereignty exercised by the English monarchy became vested in the former colonies, and as newly sovereign entities, the states drafted their own constitutions.[158]

Virginia moved first and adopted both a state constitution and a Declaration of Rights. To ensure that the new state government could not do what England had done, the Virginia Declaration of Rights listed rights that were beyond the

---

[154] *Id.* at 1794–95.

[155] John Dickinson, *Letters from a Farmer in Pennsylvania to the Inhabitants of the British Colonies, in Sources & Documents Illustrating the American Revolution 1764–1788*, at 34, 40 (Samuel Eliot Morison ed., 1967), *quoted in* Stinneford, *Unusual, supra*, at 1796 & n.346.

[156] *Journals of the House of Burgesses*, 1766–1769, at 215 (John Pendleton Kennedy ed., 1906), *quoted in* Stinneford, *Unusual, supra*, at 1745 & n.36.

[157] Holland, *Purpose & Function, supra*, at 5.

[158] *Id.*

government's power to violate. One was "[t]hat excessive bail ought not to be required, nor excessive fines imposed; nor cruel and unusual punishments inflicted."[159]

Delaware's Constitutional Convention, which convened in New Castle in August 1776, began by drafting a Declaration of Rights and Fundamental Rules of the Delaware State (the "Declaration of Rights"). "[P]rimary authorship of Delaware's 1776 Constitution and Declaration of Rights is traditionally ascribed to Thomas McKean."[160] Richard Bassett, a Kent County moderate who would later serve as a delegate to the Constitutional Convention that produced the U.S. Constitution, chaired the committee that drafted the Declaration of Rights.[161]

Section 16 of the Declaration of Rights stated: "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted."[162] In choosing that phrasing, Delaware departed from the English Bill of

---

[159] Va. Declaration of Rights § IX (June 12, 1776).

[160] Holland, *Delaware State Constitution*, *supra*, at 32. The committee assigned to draft the 1776 Constitution included McKean, Richard Bassett, and George Read. *Id.* at 7. "Years later, Thomas McKean . . . claimed authorship of the Delaware Constitution [of 1776]. As legend has it, McKean drafted the constitution during an all-night session at a tavern with nothing more than ink and a quill pen." *Id.* Justice Holland approaches that account with some skepticism, acknowledging that McKean "was undoubtedly a prominent figure at the convention," but observing that "it seems unlikely that [McKean] was the sole author." *Id.*

[161] *Id.* at 6. Bassett also served as a delegate to Delaware's second constitutional convention, became one of Delaware's first senators, was elected governor, and resigned from that position to become chief justice. *Id.*

[162] Declaration of Rights and Fundamental Rules of the Delaware State § 16 (Sept. 11, 1776).

Rights and the Virginia model by using the disjunctive "or" rather than the conjunctive "and." The choice likely reflected the drafters' interest in criminal law and commitment to penal reform. Bassett was "an advocate for the humane treatment of prisoners."[163] McKean believed that Americans needed to break from their English inheritance of harsh and sanguinary punishment, and in the 1780s, he advocated in Pennsylvania for milder punishments and for rejecting retribution as a justification.[164]

The delegates adopted the Declaration of Rights on September 11, 1776. On September 20, they adopted Delaware's first constitution, which incorporated the Declaration of Rights by reference.[165] Affirming the continuing significance of the Declaration of Rights, Article 30 of the Constitution of 1776 stated: "No article of the declaration of rights and fundamental rules of this state, agreed to by this convention, . . . ought ever to be violated on any pretence whatever."[166]

Demonstrating their knowledge of and respect for English common law, the Delaware Constitution also contained a provision adopting it. Article 25 stated: "The

---

[163] Hartnett, *Delaware's Charters*, *supra*, at 35. Justice Hartnett includes this observation about Bassett when discussing his role in drafting the Delaware Constitution of 1792. *See id.*

[164] Kevin Bendesky, *"The Key-Stone to the Arch": Unlocking Section 13's Original Meaning*, 26 U. Pa. J. Const. L. 201, 226–27 (2023).

[165] Hartnett, *Delaware's Charters*, *supra*, at 28.

[166] Del. Const. art. 30 (1776).

common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this State, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, &c. agreed to by this convention."[167] The Delaware Supreme Court has held that this provision adopted and maintained the protections in the English Bill of Rights.[168]

Delaware's Constitution of 1776 thus evidences a desire to continue the common-law tradition under which a cruel punishment was disproportionate in its effects. Delaware also demonstrated its desire to enact a broader prohibition than the English Bill of Rights and the Virginia model by using the disjunctive "or." Delaware's Constitution of 1776 thus protected against punishments that were either disproportionate or unprecedented, regardless of intent.

### c. Other States' Declarations Of Rights And The Federal Bill Of Rights

Other states followed. Pennsylvania had adopted its Declaration of Rights on August 16, 1776, and then enacted the Commonwealth's first constitution on September 28, 1776. Despite having the English Bill of Rights and the Virginia Declaration as precedents, Pennsylvania did not include a provision in its Declaration of Rights banning cruel or unusual punishment. Instead, Section 38 provided that

---

[167] *Id.* art. 25.

[168] *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 645–46 (Del. 2017).

"[t]he penal laws as heretofore used shall be reformed by the legislature of this state, as soon as may be, and punishments made in some cases less sanguinary, and in general more proportionate to the crimes."[169] Like Delaware, Pennsylvania visibly departed from the English and Virginia models.

Four more states adopted declarations of rights—Maryland, North Carolina, Massachusetts, and New Hampshire—that followed Delaware in banning cruel *or* unusual punishment.[170] When the Confederation Congress passed the Northwest

---

[169] Pa. Const. § 38 (Sept. 28, 1776). Section 39 also addressed punishment and stated: "To deter more effectually from the commission of crimes by continued visible punishments of long duration, and to make sanguinary punishments less necessary; houses ought to be provided for punishing by hard labour, those who shall be convicted of crimes not capital; wherein the criminals shall be imployed for the benefit of the public, or for reparation of injuries done to private persons: And all persons at proper times shall be admitted to see the prisoners at their labour." *Id.* § 39.

[170] *See* Md. Const. ¶ XXII (Nov. 11, 1776); N.C. Declaration of Rights ¶ X (Dec. 18, 1776); Mass. Declaration of Rights ¶ XXVI (Mar. 2, 1780); N.H. Bill of Rights ¶ XXXIII (Oct. 31, 1783). There is evidence that Delaware had drafts of the Pennsylvania and Maryland constitutions and used them when drafting its own. *See* Casey Adams, *Banishing the Ghost of Red Hannah: Proportionality, Originalism, and the Living Constitution in Delaware*, 27 Widener L. Rev. 23, 29 (2021); Holland, *Delaware State Constitution, supra*, at 6–7. In addition to Maryland's provision prohibiting "cruel or unusual punishments," a different section banned laws imposing "cruel and unusual pains and penalties." *See* Md. Const. ¶ XIV (Nov. 11, 1776) ("That sanguinary laws ought to be avoided, as far as is Consistent with the safety of the State: and no law, to inflict cruel and unusual pains and penalties, ought to be made in any case, or at any time hereafter."). Vermont also adopted a declaration of rights and a constitution during this period. Like Pennsylvania, it omitted a cruel punishment clause in favor of a different approach. *See* Vt. Const. § XXXV (July 8, 1777) ("To deter more effectually from the commission of crimes, by continued visible punishment of long duration, and to make sanguinary punishments less necessary; houses ought to be provided for punishing, by hard labor, those who shall be convicted of crimes not capital; wherein the criminal shall be employed for the benefit of the

Ordinance on July 13, 1787, it too adopted a disjunctive framing by providing that "[a]ll fines shall be moderate; and no cruel or unusual punishments shall be inflicted."[171]

Two months later, on September 17, 1787, the Constitutional Convention adopted the U.S. Constitution. At the time, it did not contain a bill of rights, and the antifederalists attacked it on that basis.[172] During the Massachusetts ratifying convention, Abraham Holmes expressed concern that Congress was "nowhere restrained from inventing the most cruel and unheard-of punishments, and annexing them to crimes; and there is no constitutional check on them, but that racks and gibbets may be amongst the most mild instruments of their discipline."[173] In Pennsylvania, dissenting delegates argued that the U.S. Constitution should not be adopted without a bill of rights providing, among other things, that "excessive bail ought not to be required, nor excessive fines imposed nor cruel nor unusual punishments inflicted."[174] Like Delaware, Maryland, North Carolina, Massachusetts,

---

public, or for reparation of injuries done to private persons; and all persons, at proper times, shall be admitted to see the prisoners at their labor.").

[171] Northwest Ordinance art. 2 (July 13, 1787).

[172] Stinneford, *Unusual*, *supra*, at 1801–03.

[173] *Id.* at 1802 (internal quotation marks omitted).

[174] *Id.* at 1803 (internal quotation marks omitted).

New Hampshire, and the Northwest Ordinance, Pennsylvania proposed a disjunctive version.

Virginia, however, led the fight for the federal Bill of Rights, and the Eighth Amendment ended up drawing on the Virginia model. Virginia ratified the Constitution and simultaneously recommended the adoption of a bill of rights tracking the Virginia Declaration of Rights.[175] When James Madison proposed the Bill of Rights to the First Congress in June 1789, his text closely followed Virginia's proposal and included the conjunctive version of the Eighth Amendment. The First Congress adopted that language verbatim.[176]

Delaware ratified the Bill of Rights on January 22, 1790.[177] Pennsylvania ratified the Bill of Rights on March 10, 1790. Six months later, Pennsylvania adopted a new state constitution.[178]

Despite having just ratified the Eighth Amendment, Article IX, Section XIII of Pennsylvania's new constitution stated "[t]hat excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted."[179] That provision omitted the "and unusual."

---

[175] *Id.* at 1807–08.

[176] *Id.* at 1808.

[177] *Bridgeville Rifle*, 176 A.3d at 646.

[178] Bendesky, *supra*, at 226.

[179] Pa. Const. art. IX, § XIII (Sept. 2, 1790).

After a cursory overview of the provision's history, a Pennsylvania Supreme Court decision from 1982 declined to interpret Pennsylvania's cruel punishment provision as having independent meaning.[180] More recent scholarship has exposed the flaws in its analysis,[181] and the Pennsylvania Supreme Court has now repudiated that earlier decision, concluding in 2026 that the drafting change was deliberate and significant.[182]

> [T]he federal drafters, based upon England's 17th century Declaration of Rights, barred punishments which were cruel, and which were not regularly or customarily imposed. Thus, the framers were not necessarily concerned with the severity of a punishment in and of itself, for, to be prohibited, the punishment had to also be unusual, *i.e.*, long disused. By contrast, Pennsylvania's founding fathers and constitutional framers exhibited a particular sensitivity to one's culpability from the earliest days of the Colonies.[183]

"Pennsylvania's founding fathers repudiated the severity of English criminal laws and de-emphasized retribution as a justification, which had served as the basis of the Eighth Amendment, and instead looked to emerging Enlightenment theories as a foundation for criminal punishment in Pennsylvania."[184] "[B]ased upon

---

[180] *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 967–68 (Pa. 1982).

[181] Bendesky, *supra,* at 248–53.

[182] *Lee*, 357 A.3d at 383; *see* Bendesky, *supra* (linking Pennsylvania's prohibition of "cruel punishments" rather than "cruel and unusual punishments" to its status as a leader in penal reform).

[183] *Lee*, 357 A.3d at 382–83.

[184] *Id.* at 383.

Enlightenment philosophy, the Pennsylvania framers advocated that only deterrence and reformation justified a punishment."[185]

Reflecting those values, Pennsylvania's constitutional text therefore prohibited cruel punishments, regardless of whether they were unusual. Pennsylvania's framers also had a specific understanding of what it meant for a punishment to be cruel: "In pamphlets, debates, articles, speeches, and lectures, they explained that only deterrence and reformation justified inflicting a punishment and that necessity girded these aims. Anything beyond that was cruel."[186] Through Pennsylvania's cruel punishment clause, the drafters sought to reject retribution as a penal justification, focus on deterrence and reformation, and treat any severity unnecessary for achieving those aims as cruel.[187] That understanding did not contemplate considering the punisher's intent.

### d.     The Delaware Constitution Of 1792

The Cruel Punishment Clause that appears in the current Delaware Constitution took shape in the Constitution of 1792. That constitution "became the basic framework for Delaware's government for more than a century, until the adoption of the current constitution in 1897."[188]

---

[185] *Id.*

[186] Bendesky, *supra*, at 219.

[187] *Id.* at 254.

[188] Holland, *Delaware State Constitution, supra*, at 11.

68

Delaware's Constitutional Convention took place in two sessions, one in 1791 and a second in 1792.[189] John Dickinson served as president of the Convention until ill health forced him to resign and continue as a delegate.[190] Richard Bassett, who chaired the committee that drafted the 1776 Declaration of Rights, was again a delegate.[191] The final product "resembled in some ways the federal constitution because of the presence of John Dickinson and Richard Bassett, who had served as members of the Philadelphia Convention, and because the members were familiar with the federal constitution."[192] But the drafters did not follow the federal constitution in all things. In particular, they "reaffirmed [Delaware's] commitment to its own declaration of rights and common law traditions."[193]

Most significantly for this case, the drafters of the Constitution of 1792 prepared a new Declaration of Rights "to enumerate, and more precisely define, the

---

[189] *Id.* at 10–11.

[190] *Id.* at 11; *see id.* (noting that after resigning as president, Dickinson remained "heavily involved"); *see also id.* at 10 (describing Dickinson as "[p]erhaps the most influential political leader present").

[191] *Id.* at 9.

[192] *Jones*, 745 A.2d at 865–66 (quoting Claudia L. Bushman et al., *Proceedings of the House of Assembly of the Delaware State 1781–1792 and of the Constitutional Convention of 1792* 36–37 (1988)); *see also Claudio v. State*, 585 A.2d 1278, 1291–98 (Del. 1991); Holland, *Delaware State Constitution*, *supra*, at 11; Hartnett, *Delaware's Charters*, *supra,* at 35.

[193] Holland, *Purpose & Function*, *supra*, at 14.

Rights reserved out of the general Powers of Government."[194] They drew on the new federal Bill of Rights, but to a far greater degree followed the Declaration of Rights in the recently adopted Pennsylvania Constitution.[195] "Almost every aspect of the 1792 Bill of Rights has a corresponding provision in the Pennsylvania constitution. Eighteen of the nineteen provisions of Delaware's 1792 Bill of Rights are nearly identical to provisions in Pennsylvania's 1790 Declaration of Rights."[196]

The Cruel Punishment Clause is one of those provisions. When the convention reenacted the Declaration of Rights, they removed the words "or unusual" from the Cruel Punishment Clause.[197] That choice followed Pennsylvania's model and contrasted with the Eighth Amendment.[198]

When Pennsylvania adopted its cruel punishment clause, the Commonwealth was seeking to eliminate retribution as a penological goal, prioritize rehabilitation and deterrence, and moderate its penal code by limiting the severity of punishment to what was necessary to achieve those aims.[199] Bassett had chaired the committee

---

[194] *Bridgeville Rifle*, 176 A.3d at 646.

[195] *Jones*, 745 A.2d at 865–66.

[196] Rodman Ward, Jr. & Paul J. Lockwood, *Bill of Rights Article I, in First 100 Years*, *supra*, at 75, 77 [hereinafter *Bill of Rights*].

[197] *Id.*

[198] *See id.* at 76–77 (noting that Delaware's constitutional revisions were influenced "by the adoption of the federal Bill of Rights in 1791 and Pennsylvania's revision of its Declaration of Rights in 1790").

[199] Bendesky, *supra*, at 254.

that drafted Delaware's original disjunctive version of its clause, so the change to

Pennsylvania's version could not have been inadvert. Bassett was "an advocate

for the humane treatment of prisoners."[200] Dickinson similarly supported criminal

and penal reform.[201] He also had a close friendship with McKean,[202] who had chaired

the Pennsylvania Convention, and strong ties of his own to Pennsylvania.[203] It thus

seems likely that Delaware followed Pennsylvania's model with the same purpose of

promoting penal reform in line with Enlightenment principles of proportionality.[204]

---

[200] Hartnett, *Delaware's Charters*, *supra*, at 35.

[201] *See* Bendesky, *supra*, at 237–38 (discussing McKean and Dickinson's advocacy in Pennsylvania for reforming the criminal code); *id.* at 239 n.268 (documenting Dickinson's role in establishing the Philadelphia Society for Alleviating the Miseries of Public Prisons, which exists today as the Pennsylvania Prison Society, and the Society's advocacy in repealing a harsh criminal law passed in 1786).

[202] *See* Stockdale & Holland, *supra*, at 133 (describing Dickinson's close friendship with McKean; "From the year 1757 until [Dickinson's] death, I [McKean] was his constant and confidential correspondent."); Holland, *Delaware State Constitution*, *supra*, at 10, 32, 37, 65, 143 (describing Dickinson and McKean's connections).

[203] Holland, *Delaware State Constitution*, *supra*, at 10 (noting that Dickinson and McKean "had allegiances to both Delaware and Pennsylvania"). Dickinson had served as president of Delaware under the Constitution of 1776 but resigned in 1782 to become governor of Pennsylvania. *Id.* At the Constitutional Convention that produced the U.S. Constitution, Dickinson attended as a representative of Delaware. *Id.* "Dickinson's prominence was such that [the delegates to Delaware's Convention of 1791] declined to use ballots and instead elected him president by voice acclamation." *Id.*

[204] *See* Adams, *supra*, at 50 (citing Dickinson's admiration for Cesare Bonesana di Beccaria and his views on proportionality in punishment); *see also* Bendesky, *supra*, at 215–45 (discussing influence of Enlightenment theorists like Beccaria and Baron de Montesquieu on the Pennsylvania framers' views on punishment and penal

Equally important, the drafters of the Delaware Constitution of 1792 went further than Pennsylvania by adding the Prisoner Health Clause, a provision with no antecedent. The records of the 1792 Convention provide no insight into the origin or intent of the Prisoner Health Clause. They say only that Article I, Section 11 was "read, considered, and unanimously adopted."[205] It thus appears that the Prisoner Health Clause, like the rest of Article I, Section 11, "was adopted as amended without any [recorded] explanation or discussion."[206]

Like the decision to follow Pennsylvania's model for the Cruel Punishment Clause, the existence of the Prisoner Health Clause indicates that the drafters of Article I, Section 11 cared about the health of prisoners and the conditions of confinement. It would be counterintuitive to think that drafters wanted prisoner health to be considered during construction but cared nothing about prison administration.

Absent evidence to the contrary, Delaware's decision to adopt Pennsylvania's

reform); *see generally* John D. Bessler, *The Italian Enlightenment and the American Revolution: Cesare Beccaria's Forgotten Influence on American Law*, 37 Mitchell Hamline L.J. Pub. Pol'y & Prac. 1 (2016). Another delegate to Delaware's 1792 convention was Kensey Johns, an attorney who went on to be a United States Senator, Chief Justice of the Court of Common Pleas, and Chancellor of the Court of Chancery. He too endorsed Beccaria's views on punishment and the need for proportionality. Adams, *supra*, at 50.

[205] *Minutes of the Grand Committee of the Whole Convention of the Delaware State* 12 (Wilmington, James Adams 1792).

[206] Adams, *supra*, at 30.

cruel punishment clause and include the Prisoner Health Clause suggests broad agreement with an approach to penal reform that prioritized rehabilitation and deterrence, demanded proportionality, and did not turn on the punisher's intent. Whether a punishment was cruel would turn on its effects, consistent with the common-law origins of the concept and Enlightenment principles.

### e. The Delaware Constitution Of 1897

The next stop is the Constitution of 1897, over a century later. The intervening Constitution of 1831 made minor changes to the Constitution of 1792, which principally involved reorganizing the judiciary.[207] That 1831 Constitution is thus "better seen as a modification of the 1792 Constitution."[208] It was the Constitution of 1897 that established the framework for Delaware's current system of government.

After the Civil War, there was renewed interest in the structure and operation of state government. "Between 1864 and 1879, thirty-seven new state constitutions were written and ratified."[209] When drafting the new constitution, however, the delegates did not make changes to the Cruel Punishment Clause. They revered the Declaration of Rights, and they "had no intention of altering a bill of rights that was by then nearly one hundred years old" and which they acknowledged to have developed "out of the long and unique heritage of the English common law and the

---

[207] Holland, *Delaware State Constitution*, *supra*, at 12–13.

[208] *Id.* at 15.

[209] Holland, *Purpose & Function*, *supra*, at 18.

73

history of Delaware."[210] The report from the committee charged with reviewing the

Declaration of Rights stated:

> This [Declaration of Rights] is regarded, astonishingly and with great unanimity, by the Members of the Convention, as almost the same document. Gentlemen of the Convention are so earnest and anxious that they may transmit this valuable relic of the former centuries to their children and grand-children, and they might point to themselves with pride, that they have left it simply intact, scarcely a dot from the *i* or a cross from the *t* being omitted.[211]

The Cruel Punishment Clause continued unchanged, as did the Prisoner Health

Clause.

Viewed as a whole, the evolution of the Delaware Constitution from 1776 until

1897 demonstrates a consistent concern about cruel punishments, without regard to

cruel intent, and independent of whether they might be unusual. The Constitution of

1776 departed from the English and Virginia models by banning "cruel or unusual

punishment" rather than "cruel and unusual punishment." The Constitution of 1792

departed from the federal model and followed Pennsylvania's example in prohibiting

"cruel punishment." The Constitution of 1792 also added the Prisoner Health Clause.

That history supports giving the Cruel Punishment Clause independent

meaning. It counsels against interpreting the Cruel Punishment Clause as requiring

a showing of cruel intent.

---

[210] Ward & Lockwood, *Bill of Rights, supra*, at 78; *accord* Holland, *Delaware State Constitution, supra*, at 32.

[211] 4 *Debates and Proceedings of the Constitutional Convention of the State of Delaware* 2386 (1958).

### 3.    State Law

The third *Hunt* factor calls for examining "[p]reviously established bodies of state law."[212] Preexisting law may "suggest distinctive state constitutional rights" and "can help to define the scope of the constitutional right later established."[213] Although not called out as a *Hunt* factor, this decision also considers subsequent state law. Both support interpreting the Cruel Punishment Clause as having independent content that does not require a showing of cruel intent.

### a.    Preexisting State Law

There is frankly not much state law addressing the Cruel Punishment Clause before 1897. The Delaware Supreme Court's analysis in *Dorsey*,[214] however, illustrates the significance of what little law there is.

In *Dorsey*, the Delaware Supreme Court relied on preexisting state law when giving independent meaning to the prohibition on unreasonable searches and seizures in Delaware's Declaration of Rights (the "Search and Seizure Clause"). Like this decision, *Dorsey* noted that "[t]he original Delaware Constitution and Declaration of Rights were adopted in September 1776—approximately two months after the Declaration of Independence and fifteen years *before* the federal Bill of

---

[212] *Jones*, 745 A.2d at 864.

[213] *Id.*

[214] *Dorsey v. State*, 761 A.2d 807 (Del. 2000).

Rights."[215] *Dorsey* observed that the Delaware Constitution of 1776 included both the antecedent to the Search and Seizure Clause and a clause that adopted the common law of England as the law of Delaware.[216] The opinion remarked, consistent with this decision, that many leading American lawyers studied at the Middle Temple in England, resulting in "'a deep respect for, and a close knowledge of, the Common Law.'"[217] *Dorsey* also cited Blackstone for the "'settled and invariable principle'" that "'every right, when withheld, must have a remedy, and every injury its proper redress.'"[218]

Based on this history, the justices concluded that "it is logical to infer that by specifically adopting the existing common law of England, the framers of Delaware's first Constitution and Declaration of Rights contemplated that there would be a remedy for the violation of the right to be free from illegal searches and seizures."[219] The same reasoning applies to the Cruel Punishment Clause.

*Dorsey*'s analysis also sheds light on whether to read a requirement of cruel intent into the Cruel Punishment Clause. In *Dorsey*, the State argued that violations

[215] *Id.* at 815.

[216] *Id.* at 816.

[217] *Id.* (quoting Chief Justice William H. Taft, *Foreword* to E. Alfred Jones, *American Members of the Inns of Court* (1924)).

[218] *Id.* (quoting 3 William Blackstone, *Commentaries* \*109, *cited in Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803)).

[219] *Id.* at 816–17.

of the Search and Seizure Clause should be excused if the police acted in good faith, consistent with decisional law under the Fourth Amendment.[220] *Dorsey* gave three reasons for refusing to adopt a similar defense under the Search and Seizure Clause, each of which applies by analogy to the Cruel Punishment Clause.

First, *Dorsey* stressed that under Article 30 of Delaware's Constitution of 1776, "No article of the declaration of rights and fundamental rules of this state . . . ought ever to be violated on *any pretence* whatever . . . ."[221] The justices concluded that "[e]xcusing 'good faith' violations of the constitutional right to be free from illegal searches and seizures is exactly the type of 'pretence' that Article 30 in Delaware's 1776 Constitution expressly prohibited."[222] The same reasoning applies to the Cruel Punishment Clause and any attempts to introduce *scienter*-based requirements that run contrary to the text.

Second, *Dorsey* reasoned that a good-faith defense would contradict Blackstone's imperative that "'every right, when withheld, must have a remedy, and every injury its proper redress.'"[223] After noting that John Dickinson and Thomas McKean were contemporaries of Blackstone and students of English common law,

---

[220] *Id.* at 814 (citing *United States v. Leon*, 468 U.S. 897 (1984)).

[221] *Id.* (emphasis and alterations in original) (quoting Del. Const., art. XXX (1776)).

[222] *Id.*

[223] *Id.* at 816 (quoting 3 William Blackstone, *Commentaries* \*109, *cited in Marbury*, 5 U.S. (1 Cranch) at 163).

*Dorsey* concluded that "in the absence of any provisions to the contrary, that John Dickinson and the other framers of Delaware's 1792 Constitution intended to continue the common law principle that there must be a remedy for the violation of any vested right."[224] In *Dorsey*, that right was the Search and Seizure Clause. The same reasoning applies to the Cruel Punishment Clause.

Third, *Dorsey* stressed that the original Search and Seizure Clause predated the Fourth Amendment by fifteen years and that when adopting the Constitution of 1792, Delaware followed the language of the Pennsylvania Constitution rather than the language of the Fourth Amendment.[225] The same is true for the Cruel Punishment Clause.

*Dorsey* thus relied on preexisting Delaware law to conclude that the Search and Seizure Clause had independent meaning and did not incorporate a mental-state requirement that federal law had read into the Fourth Amendment. The same reasoning supports giving the Cruel Punishment Clause independent meaning and not incorporating the cruel-intent requirement that federal law has read into the Eighth Amendment.

---

[224] *Id.*

[225] *Id.*

### b. Subsequent State Law

Although not identified as one of the *Hunt* factors, post-1897 Delaware cases interpreting the Cruel Punishment Clause are relevant. The Commissioner mistakenly views that law as dispositively calling for lockstep interpretation.

The Commissioner principally relies on *Cannon I*, a decision from 1963 in which the Delaware Supreme Court first interpreted the Cruel Punishment Clause.[226] There, the justices accepted a certified question to determine whether lashes violated the Cruel Punishment Clause.[227] After quoting the Cruel Punishment Clause and noting its predecessor in the Constitution of 1776, the justices wrote:

> Therefore, since the independence of the State of Delaware, there has been in its basic law a prohibition against the infliction of cruel punishment for crime. This prohibition has existed in substantially the same form since 1776, for we think the omission of the phrase 'or unusual' has little or no significance.[228]

---

[226] *State v. Cannon* (*Cannon I*), 190 A.2d 514 (Del. 1963).

[227] Based on how the certified question was framed, the justices stressed that "we are not required to determine whether the sentence actually imposed is excessive or disproportionate; nor are we called upon to decide the desirability or undesirability of whipping as a punishment for crime." *Id.* at 589. They also disclaimed expressing any personal opinion "for or against the retention of the penalty of whipping as punishment for crime." *Id.*

[228] *Id.* at 590.

The Commissioner interprets the "little or no significance" reference as a determination that the Cruel Punishment Clause might as well say "cruel and unusual" and should be read in lockstep with the Eighth Amendment.[229]

That conclusion does not follow. The certified question in *Cannon I* asked whether lashes were cruel under the Cruel Punishment Clause. The predecessor provision in the Delaware Constitution of 1776 barred cruel *or* unusual punishments, so it also barred punishments that were cruel. Given that fact, the omission of "or unusual" indeed lacked significance for *Cannon I*. Nothing in the decision suggests generally that "cruel" is the same as "cruel and unusual" such that the Cruel Punishment Clause and the Eighth Amendment must be applied in lockstep. As this decision has shown, the text and legislative history counsel against reading the two in lockstep.

On the merits, *Cannon I* held that whipping did not violate the Cruel Punishment Clause. Five years earlier, in a plurality opinion addressing whether denationalization was a "cruel and unusual punishment" for the crime of desertion,

---

[229] *See* Dkt. 48 at 45 ("But Article I, Section 11 prohibits 'cruel punishments,' while the Eighth Amendment prohibits 'cruel *and unusual* punishments.' Plaintiffs attach significant meaning to this difference and offer a lengthy analysis of the *Hunt* factors to suggest that the Delaware Constitution affords broader protection than the Eighth Amendment. Plaintiffs' effort is misspent because Delaware courts have repeatedly stated that omission of 'unusual' in Article I, Section 11 'has little or no significance.' The Delaware Supreme Court originally made this point in 1963 in *State v. Cannon*." (emphasis in original) (footnotes omitted)).

Chief Justice Warren had articulated a new test for the Eighth Amendment.[230] Citing an earlier observation that the Eighth Amendment "may acquire meaning as public opinion becomes enlightened by a humane justice,"[231] Chief Justice Warren wrote that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."[232] Without citing that authority,[233] the Delaware Supreme Court agreed that the Cruel Punishment Clause required interpretation based on the standards of the day.[234] But the justices held that determining whether a punishment violated the Cruel Punishment Clause was

---

[230] *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

[231] *Weems v. United States*, 217 U.S. 349, 378 (1910).

[232] *Trop*, 356 U.S. at 101.

[233] *Cannon I* cited only five U.S. Supreme Court precedents: *Robinson v. California*, 370 U.S. 660 (1962); *Weems*, 217 U.S. 349; *Holden v. Hardy*, 169 U.S. 366 (1898); *In re Kemmler*, 136 U.S. 436 (1890); *Wilkerson v. Utah*, 99 U.S. 130 (1878). The court did not engage in meaningful discussion of any of them, and four notably dated from an earlier era before *Robinson* used the Due Process Clause of the Fourteenth Amendment to incorporate the Eighth Amendment against the states. The minimal consideration that *Cannon I* gave to federal caselaw suggests that the Delaware Supreme Court regarded the Cruel Punishment Clause as having content independent of the Eighth Amendment.

[234] *Cannon I*, 190 A.2d at 516 ("[W]hen the construction of the provisions and safeguards of a Constitution is required, the words employed are not necessarily static in meaning, but grow and change as the conditions of modern society and knowledge grow and change with the passage of years."); *id.* at 517 ("We accept unquestionably that Constitutions are living documents in the sense that the phraseology used in them grows and changes with the passage of time. The meanings of words change and grow with the changing sensibilities, beliefs and knowledge of man." (citation omitted)).

81

"not our function"[235] because only the General Assembly could speak definitively to that issue.[236] After identifying "no legal and effective expression of the people speaking through the General Assembly that whipping is a cruel punishment in the constitutional sense,"[237] the justices concluded that "[j]udicial restraint and a proper recognition of the function of the Legislative and Judicial branches of government compel us to express no opinion."[238]

---

[235] *Id.* at 517.

[236] *Id.* at 517–18 ("We think, however, that this change, this growth, this enlightened meaning of words used in Constitutions, comes about by reason of the beliefs of the people themselves. The change may not come solely by reason of the individual belief of an individual judge. What better way is there for the people to express an enlightened attitude toward the punishment of crime than through their elected representatives, the members of the General Assembly who, indeed, hold their office for the very purpose of expressing the will and beliefs of the people who elected them. . . . If the people feel strongly enough upon a subject, their elected representatives respond to their will.").

[237] *Id.* at 518.

[238] *Id.* That reasoning is suspect. As the Delaware Supreme Court later observed in *Sanders*, "if we automatically conclude that Sanders' sentence is proportionate to his fault merely because the General Assembly has ordained that death is an acceptable punishment for a defendant such as Sanders, the proportionality test becomes meaningless." *Sanders*, 585 A.2d at 144–45. A test that defers to the General Assembly's determination of what constitutes cruelty means that the courts can only enforce the Cruel Punishment Clause after public opinion has turned in favor of convicted criminals not being subjected to a particular punishment. *See* Stinneford, *Unusual*, *supra*, at 1754. It means the constitutional protection does nothing during moral panics when public opinion turns against convicted criminals and in favor of cruelty. *See id.* That outcome runs contrary to the purpose of constitutional rights, because "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638

By expressing no opinion, the Delaware Supreme Court upheld the constitutionality of whipping, a decision it would twice reaffirm in 1963.[239] At the time, Justice Douglas had singled out "the whipping post" in a concurring opinion as a barbarous punishment.[240] In 1968, the future Justice Blackmun held that whipping was a cruel punishment that violated the Eighth Amendment.[241] *Cannon I* thus established that the Cruel Punishment Clause had content distinct from the Eighth

---

(1943). Convicted criminals are highly likely to constitute a discrete and insular minority that ordinary political processes cannot effectively protect. *Cf. United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938) ("[P]rejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry."). *Cannon I*'s principle of absolute legislative deference shirks the court's "province and duty . . . to say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177 ("It is emphatically the province and duty of the judicial department to say what the law is."), *quoted without citation in Sanders*, 585 A.2d at 146.

[239] *See Balser v. State*, 195 A.2d 757, 758 (Del. 1963) (holding that the inclusion of lashes in a sentence did not violate the Cruel Punishment Clause); *Cannon v. State* (*Cannon II*), 196 A.2d 399, 400 (Del. 1963) (holding that a sentence of lashes did not violate the Cruel Punishment Clause and was therefore not illegal for purposes of a challenge under Superior Court Criminal Rule 35(a)). In 2021, the Delaware Supreme Court held that Superior Court Rule 35(a) could not be used to challenge conditions and events that occurred in prison while serving a sentence. *Price v. State*, 247 A.3d 687, 2021 WL 567685, at *1–2 (Del. 2021) (TABLE).

[240] *Robinson*, 370 U.S. at 668 (Douglas, J., concurring).

[241] *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968) ("[W]e have no difficulty in reaching the conclusion that the use of the strap in the penitentiaries of Arkansas is punishment which, in this last third of the 20th century, runs afoul of the Eighth Amendment; that the strap's use, irrespective of any precautionary conditions which may be imposed, offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess; and that it also violates those standards of good conscience and fundamental fairness enunciated by this court.").

Amendment, albeit independent content that provided less protection. The Delaware General Assembly rendered the issue moot by eliminating lashes as a penalty when it revised Delaware's criminal code in 1973.[242]

Other Delaware Supreme Court decisions have also interpreted the Cruel Punishment Clause as having independent content that departed from the Eighth Amendment. For example, decisions from the same era as *Cannon I* held that the term of imprisonment that the General Assembly has imposed for a crime is beyond the Delaware Supreme Court's power to review under the Cruel Punishment Clause.[243] Federal courts applying the Eighth Amendment take a different approach;

---

[242] Kim E. Ayvazian, *Criminal Law*, *in Delaware Supreme Court Golden Anniversary 1951–2001*, 133, 143 (Randy J. Holland & Helen L. Winslow eds., 2001).

[243] *Williams v. State*, 286 A.2d 756, 757 (Del. 1971) ("Imprisonment, itself, cannot be said to be violative of the constitutional proscription. The limits of the term of imprisonment, deemed consonant to fit the nature of the crime, have been matters for legislative determination traditionally. So long as drug offenses are deemed crimes by the General Assembly, terms of imprisonment prescribed therefor by the General Assembly cannot be deemed cruel and inhuman punishment."); *State v. Ayers*, 260 A.2d 162, 169 (Del. 1969) (explaining that "the fixing of penalties for crime was a matter for determination by the General Assembly as the voice of the people, and that its action, within the traditional limitations of forms of punishment will not be struck down by the courts"); *Cannon II*, 196 A.2d at 400 (rejecting argument that punishing larceny with whipping was so excessive and disproportionate as to violate the Cruel Punishment Clause because it fell "within the province of the General Assembly in its wisdom to prescribe maximum penalties for crimes" and "the fixing of penalties for crimes is a matter for action by the General Assembly"). Along similar lines, the Delaware Supreme Court lacks the power on appeal to reduce a sentence that falls within the maximum penalty allowed by statute. *See Osburn v. State*, 224 A.2d 52, 52 (Del. 1966) ("This Court has no power on appeal to reduce a sentence which is within the maximum penalty allowed by the statute."); *Seeney v. State*, 211 A.2d 908, 909 (Del. 1965) (explaining that the court is "without authority on appeal to reduce as excessive an imposed sentence which fell within the statutorily

they grant substantial deference to Congress's determinations regarding appropriate criminal punishments, but they do not regard them as outside the bounds of Eighth Amendment review.[244] Once again, the Cruel Punishment Clause has separate content from the Eighth Amendment, albeit content that provides less protection.[245]

---

prescribed limits of punishment"). The Delaware Supreme Court has also held that "[t]he mere presence of a constitutional question, no matter how important, is not sufficient to confer jurisdiction upon this Court." *Shoemaker v. State*, 375 A.2d 431, 436 (Del. 1977).

[244] *E.g.*, *Solem v. Helm*, 463 U.S. 277, 288–90 (1983) (holding that the Eighth Amendment's proportionality principle applies to imprisonment as well as to "the lesser punishment of a fine and the greater punishment of death" but recognizing that "[r]eviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals"); *United States v. Wallace*, 269 F.2d 394, 398 (3d Cir. 1959) ("A sentence within the limits prescribed by law for an offense will not ordinarily be regarded as cruel or unusual or excessive punishment."); Howard J. Alperin, Annotation, *Length of Sentence as Violation of Constitutional Provisions Prohibiting Cruel and Unusual Punishment*, 33 A.L.R.3d 335 (1970 & Supp.) ("[T]he cases are legion which hold that regardless of its severity or length, a sentence of imprisonment within the limits of a statute which is in itself valid and constitutional does not ordinarily amount to cruel and unusual punishment.").

[245] *Sanders*, 585 A.2d at 146 ("[U]nlike the Eighth Amendment, Article I, Section 11 does not bar the imposition of a *jail* sentence that is arguably disproportionate."). In contrast to a prison sentence, the Delaware Supreme Court has held that the Cruel Punishment Clause requires that "a death sentence be proportionate to a defendant's culpability and that it accomplish some legitimate penological end." *Id.* at 147.

Current Delaware law permits a prisoner to challenge a sentence as excessive in a specific case, such as if the judge approached sentencing with a closed mind and refused to consider mitigating evidence. *See Cannon II*, 196 A.2d at 400 (agreeing that a sentence could be excessive in a specific case and remanding so that the parties could create a factual record on that issue); *accord Gingerich v. State*, 342 A.3d 401 (Del. 2025) ("When the sentence imposed is within the statutory limits, we will not

Most significantly, when asked in *Sanders* to hold that the Cruel Punishment Clause had the same meaning as the Eighth Amendment for purposes of reviewing the proportionality of a capital sentence, the Delaware Supreme Court described as "untenable" the argument "that our Constitution must mean exactly the same thing as the United States Constitution."[246] The court did state generally that its interpretation of the Cruel Punishment Clause would be "guided by the same general

---

find that the trial court abused its discretion 'unless it is clear that the sentencing judge relied on impermissible factors or exhibited a closed mind.' . . . During sentencing, the trial court must 'have an open mind for receiving all information related to the question of mitigation.'" (quoting *Weston v. State*, 832 A.2d 742, 746 (Del. 2003))).

The availability of that form of review parallels federal caselaw interpreting the Eighth Amendment. *E.g.*, *Smith v. Texas*, 543 U.S. 37, 45 (2004) (upholding Eighth Amendment challenge to capital sentence where jury was not provided with mitigating evidence about defendant's childhood and diminished mental abilities). The Eighth Amendment also permits challenges to sentences that are greatly disproportionate to the conduct being punished. *See, e.g.*, *Forehand v. State*, 997 A.2d 673, 676 (Del. 2010) (describing and applying Eighth Amendment test); *Wehde v. State*, 983 A.2d 82, 87 (Del. 2009) (same); *Wallace*, 956 A.2d at 638–39 (same).

In my view, the Delaware decisions from the 1960s that rejected any form of proportionality review for prison sentences were wrongly decided. The legislative history of the Cruel Punishment Clause shows that the drafters drew on Pennsylvania's model. Pennsylvania was a leader in prison reform, and the framers of its provision contemplated meaningful proportionality review. The Delaware decisions in the 1960s did not have access to recent research into that legislative history and should be revisited. Even on their own terms, one scholar has criticized those decisions as resting on an "unjustified reading of Blackstone." Granucci, *supra*, at 865. Another commentator has argued persuasively for revisiting the 1960s decisions and taking the Cruel Punishment Clause in a new direction. *See* Adams, *supra*, at 42–53.

[246] *Sanders*, 585 A.2d at 145.

principles that have guided the Supreme Court's interpretation of the Eighth Amendment,"[247] and in a footnote the justices cited *Cannon I* as holding that "[t]he absence of the words 'and unusual' in Delaware's formulation has been held to be of little or no significance."[248] The Commissioner interprets those comments as reaffirming her interpretation of *Cannon I,* under which the Cruel Punishment Clause might as well say "cruel and unusual" and should be read in lockstep with the Eighth Amendment.[249]

Once again, that conclusion does not follow. *Sanders* determined whether imposing a death sentence on a person adjudicated guilty but mentally ill constituted cruel punishment. The predecessor provision in the Delaware Constitution of 1776 barred cruel *or* unusual punishment. Whether the punishment was "unusual" was never at issue. For the Delaware Supreme Court to endorse the "same general principles" used to interpret the Eighth Amendment did not signal a lockstep

---

[247] *Id.* at 144.

[248] *Id.* at 144 n.23 (citing *Cannon I*, 190 A.2d at 515). *Sanders* observed that "[s]ince the Delaware Constitution is an organic body of law, there is no reason why it cannot be interpreted to provide *fewer* protections than the Federal Constitution." *Id.* at 146 n.25 (emphasis in original). The comment provides further evidence that the Cruel Punishment Clause has independent content. On the merits, however, *Sanders* concluded that like the Eighth Amendment, "Article I, Section 11 of the Constitution of 1897 also does not preclude execution of a defendant following a guilty but mentally ill verdict." *Id.* at 144.

[249] Dkt. 48 at 45–46 ("The Delaware Supreme Court reiterated this position in 1990 in *Sanders v. State*.").

interpretation of the Cruel Punishment Clause, particularly given *Sanders'* emphasis on independent meaning.[250]

The Commissioner also relies on *Desmond*, a Delaware Superior Court decision from 2024 that stated broadly that "Article I, Section 11 [of the Delaware Constitution] provides the same rights as the Eighth Amendment" to the U.S. Constitution.[251] *Desmond* did not review the *Hunt* factors. *Desmond* simply relied on *Cannon I*. It is therefore no more persuasive than the dictum in that decision.

*Desmond* also rejected an argument that should be impossible to ignore. Whether "and unusual" matters for the Cruel Punishment Clause's relationship to the Eighth Amendment depends both on how the Delaware Supreme Court interprets the omission and on how the Supreme Court of the United States interprets its presence. In 1963, when *Cannon I* was decided, the Supreme Court of the United States had indicated five years earlier that the words "and unusual" were effectively surplusage.[252] When introducing the evolving-standards-of-decency test, *Trop* addressed the meaning of "unusual" in a footnote. Summarizing decisions dating to 1878, it stated:

> On the few occasions this Court has had to consider the meaning of the phrase, precise distinctions between cruelty and unusualness do not seem to have been drawn. These cases indicate that the Court simply examines the particular punishment involved in light of the basic

---

[250] *See Sanders*, 585 A.2d at 144–48.

[251] *Desmond v. State*, 2024 WL 3456225, at \*6 (Del. Super. July 16, 2024).

[252] *Trop*, 356 U.S. at 100–01.

prohibition against inhuman treatment, without regard to any subtleties of meaning that might be latent in the word 'unusual.' If the word 'unusual' is to have any meaning apart from the word 'cruel,' however, the meaning should be the ordinary one, signifying something different from that which is generally done.[253]

That framing left the content of "unusual" ambiguous and suggested that its inclusion likely did not matter. When *Cannon I* observed that omitting "unusual" was likely insignificant, it echoed Eighth Amendment jurisprudence at the time.

That is no longer true. In 1991, Justice Scalia recast the Eighth Amendment as only banning inherently cruel methods of punishment already unacceptable in eighteenth-century America.[254] He argued that the transition from "illegall and cruell" in the English Declaration of Rights to "cruell and unusuall" in the English Bill of Rights suggested equating "unusual" with "illegal," then posited that any punishments that the legislature authorizes must be legal, so "unusual" must mean something else. He concluded that the term carried its customary contemporary meaning of "punishment[s] that are not regularly or customarily employed."[255] In

---

[253] *Id.* at 100 n.32 (citations omitted).

[254] *Harmelin v. Michigan*, 501 U.S. 957, 994–96 (1991). Justice Scalia also used his interpretation to reject the longstanding view that the Eighth Amendment included a requirement of proportionality. *See id.* at 976–85. As a historical matter, both conclusions are suspect. *See* John F. Stinneford, *Law, Politics, and the Eighth Amendment*, 2024 Cato Sup. Ct. Rev. 231, 240–46; Michael Vitiello, *Justice Scalia's Eighth Amendment Jurisprudence: An Unabashed Foe of Criminal Defendants*, 50 Akron L. Rev. 175 (2016); Michael J. Zydney Mannheimer, Harmelin's *Faulty Originalism*, 14 Nev. L.J. 522 (2014).

[255] *Harmelin*, 501 U.S. at 976.

other words, he read it to mean "out of the ordinary."[256] Under that interpretation, the Eighth Amendment only bans "cruel methods of punishment that are not regularly or customarily employed."[257] Since then, the Court has treated the Eighth Amendment as forbidding only punishments that are both cruel *and* unusual.[258]

---

[256] Stinneford, *Unusual, supra*, at 1767. That was ahistorical. As Professor Stinneford has since shown, "unusual" in seventeenth century England did not mean "illegal" in the sense of contrary to legislation. It meant contrary to common-law precedent based on custom and practice of long usage. *Id.* at 1764. The change from illegal to unusual introduced a term of art from the common law. *Id.* at 1764, 1767. A punishment under English common law and in the Founding Era could be enacted in accordance with law and yet still be "unusual" and therefore void. *Id.* at 1764.

[257] *Harmelin*, 501 U.S. at 976.

[258] *E.g.*, *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024) (distinguishing between punishments that "were 'cruel' because they were calculated to 'superad[d]' 'terror, pain, or disgrace'" and punishments that "were 'unusual' because, by the time of the Amendment's adoption, they had 'long fallen out of use'" (alteration in original) (additional internal quotation marks omitted)); *Glossip v. Gross*, 576 U.S. 863, 938 (2015) (Breyer, J., dissenting) ("The Eighth Amendment forbids punishments that are cruel and *unusual*." (emphasis in original)); *Baze*, 553 U.S. at 97 (Thomas & Scalia, JJ., concurring) (reiterating interpretation of Eighth Amendment under which it only addressed punishments already regarded as cruel during the Founding Era and only barred those no longer "regularly or customarily employed"); *Helling v. McKinney*, 509 U.S. 25, 42 (1993) (Thomas, J., dissenting) ("To state a claim under the Cruel and Unusual Punishments Clause, a party must prove not only that the challenged conduct was both cruel and unusual, but also that it constitutes *punishment*." (emphasis in original)). In death penalty cases, the Court applies its evolving-standards-of-decency test by looking to the number of states that allow the sentence and the rate of jury sentencing outcomes, both of which track how unusual the outcome is. *Compare Stanford v. Kentucky*, 492 U.S. 361 (1989) (upholding death penalty for sixteen- and seventeen-year-olds where "[o]f the 37 States whose laws permit capital punishment, 15 decline to impose it upon 16-year-old offenders and 12 decline to impose it on 17-year-old offenders," and where juries were willing to impose it), *with Roper v. Simmons*, 543 U.S. 551 (2005) (holding death penalty for sixteen- and seventeen-year-olds to be unconstitutional where "30 States prohibit the juvenile death penalty, comprising 12 that have rejected the death

Once the Supreme Court of the United States asserted that the inclusion of "and unusual" carried semantic significance, it was no longer persuasive to rely on dictum in *Cannon I*—a decision from long before that pivot—that summarily dismissed the omission of "and unusual" as insignificant. The Pennsylvania Supreme Court faced a similar conundrum because it too minimized the significance of omitting "and unusual" from its cruel punishment clause in 1982. In 2026, however, the court revisited the question. After reviewing recent research into the legislative history of the clause and its intent, the Pennsylvania Supreme Court concluded "that the cruel punishments provision in the Pennsylvania Constitution, which does not use the term 'unusual,' has a distinct meaning and application."[259]

penalty altogether and 18 that maintain it but, by express provision or judicial interpretation, exclude juveniles from its reach," where the direction of change was toward abolition, where numerous foreign countries had abolished it, and where international treaties to which the United States was not a party condemned it).

[259] *Lee*, 357 A.3d at 380. That outcome was logically required. *See* Bendesky, *supra*, at 211 ("[B]y the Supreme Court's own logic, Section 13 cannot mean what the Eighth Amendment means. The Pennsylvania court thus adopts the meaning of the Eighth Amendment for its constitution, although the U.S. Supreme Court has effectively declared that the meaning of the Eighth Amendment hinges on its departure from the Pennsylvania Constitution."). Although the proposition seems intuitive, consider a bit of elementary set theory. Let C denote the set of cruel punishments and U the set of unusual punishments. The Cruel Punishment Clause prohibits every punishment in C. The Eighth Amendment, read conjunctively, prohibits only the intersection of the two sets—punishments that are both cruel and unusual. When *Trop* discounted the meaning of unusual, it treated the intersection of C and U as simply C. On that assumption, "unusual" filters nothing out, so it is correct to say that C is the same as C and U. But the moment "unusual" takes on meaning, the intersection of C and U is no longer equivalent to C. The intersection is necessarily smaller than C. So as soon as the Supreme Court of the United States

91

For purposes of challenges to prison conditions, Delaware's different approach stands out even more. A Delaware court has previously considered a challenge to conditions of confinement under the Cruel Punishment Clause only once, but that decision issued in 1947.[260] In *Robertson*, a convicted minor asserted that his transfer from one facility to another violated the Cruel Punishment Clause. The court stressed that the answer depended not on the "mere fact of change, but rather the actual conditions and manner of incarceration which exist as a consequence of the change."[261] The decision thus called for examining effects, not intent. It would take nearly three decades before the Supreme Court of the United States applied the Eighth Amendment to prison conditions[262] and required a showing of cruel intent.[263]

It may once have been largely accurate to say that the omission of "and unusual" from the Cruel Punishment Clause lacked significance—at least based on how the Supreme Court of the United States was interpreting the Eighth Amendment. It is not what the text or historical evidence indicates. And it is not true today, after the Supreme Court of the United States has moved in different directions.

---

gave "unusual" independent meaning, the two provisions could no longer be equivalent.

[260] *In re Robertson*, 54 A.2d 848, 850 (Del. Ct. Gen. Sess. 1947).

[261] *Id.*

[262] *See Estelle v. Gamble*, 429 U.S. 97 (1976).

[263] *See infra* Section IV.A.5.b.

4.    **Structural Differences In the Constitutional Frameworks**

The fourth *Hunt* factor notes that "[d]ifferences in structure between the federal and state constitutions" may provide a basis for interpreting a state constitutional protection differently.[264] Pertinent structural differences include different constitutional purposes and different provisions.

a.    **Different Constitutional Purposes**

The Delaware and federal constitutions have distinct purposes. Unlike the U.S. Constitution, which is "a grant of enumerated powers to the federal government," the Delaware Constitution "serves only to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives."[265] Consequently, "the explicit affirmation of fundamental rights in our Constitution can be seen as a guarantee of those rights and not as a restriction upon them."[266]

State declarations of rights long stood as the principal guarantors of individual freedoms. When the U.S. Constitution was ratified, state declarations of rights were paramount. When the movement to add a federal bill of rights took shape, some federalists responded that a federal bill of rights was unnecessary because "the State Declarations of Rights are not repealed by this Constitution . . . and being in force are

---

[264] *Jones*, 745 A.2d at 864.

[265] *Id.*

[266] *Id.*

93

sufficient."[267] Chief Justice Marshall penned a unanimous decision holding that the federal Bill of Rights afforded no protection against state governments *and that federal protection was not needed*:

> Each state established a constitution for itself, and in that constitution, provided such limitations and restrictions on the powers of its particular government, as its judgment dictated . . . .

> In their several constitutions [the states] have imposed such restrictions on their respective governments, as their own wisdom suggested; such as they deemed most proper for themselves. It is a subject on which they judge exclusively. . . .[268]

Consequently, "from the Declaration of Independence until the Civil War, state declarations of rights were the primary guarantors of individual rights and civil liberties against infringement by the state government."[269]

In 1897, when Delaware adopted its current constitution, the federal Bill of Rights remained "relatively unimportant compared to the bills of rights of the individual states."[270] "[T]he understanding of the Fourteenth Amendment in 1897 was that it did not apply individual federal rights against state governments. The first case in which the Due Process Clause of the Fourteenth Amendment was held

---

[267] 2 *The Records of the Federal Convention of 1787*, at 588 (M. Farrand ed., 1911), *quoted in* Holland, *Purpose & Function*, *supra*, at 12 n.58.

[268] *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243, 247–48 (1833).

[269] Holland, *Purpose & Function*, *supra*, at 13.

[270] Ward & Lockwood, *Bill of Rights*, *supra*, at 82.

to apply to state action was decided that very year—1897."[271] When delegates to the Convention of 1896–97 decided to keep the Declaration of Rights unchanged, they believed they were maintaining in the most direct way possible the fundamental rights they could assert against their state government.

Today the Supreme Court of the United States has applied most of the federal Bill of Rights to the states through the Fourteenth Amendment. Yet federal constitutional standards continue to reflect "only a minimum level of protection."[272]

> The declaration of rights or substantive provisions in a state's constitution may, and often do, provide for broader or additional rights. The expansion beyond federally guaranteed individual liberties by a state constitution is attributable to a variety of reasons: differences in textual language, legislative history, pre-existing state law, structural differences, matters of particular concern, and state traditions.[273]

Although states must comply with federal minimums, state constitutions "can provide an independent and adequate basis for the adjudication of certain claims."[274]

This history is particularly salient for the Cruel Punishment Clause. Delaware adopted the original version of the clause in 1776, before the U.S. Constitution or the Bill of Rights existed. Delaware adopted the current version in 1792. The Supreme

---

[271] *Id.* at 82–83 (citing *Chi. B. & Q. R.R. Co. v. Chicago*, 166 U.S. 226 (1897)).

[272] Holland, *Purpose & Function*, *supra*, at 17.

[273] *Id.* (footnote omitted).

[274] *Id.*

Court of the United States did not apply the Eighth Amendment to the states until one hundred seventy years later.[275]

The Eighth Amendment's late arrival makes it unlikely that the two provisions would have developed identically or have the same content. In *Sanders*, the Delaware Supreme Court made precisely that point:

> The State's argument that state constitutional interpretation should slavishly follow federal law has some curious implications. Since the Bill of Rights was not made binding upon the States until the adoption of the Fourteenth Amendment in 1868, it must be conceded that state constitutional protections had significance prior to that point.

> Thus, the State is asking us to conclude that the Fourteenth Amendment should be treated as if it abolished the independent force of state provisions that are similar to incorporated federal provisions. Of course, the Fourteenth Amendment had no such effect, and we can discern no basis in Delaware law for treating it as if it had. Indeed, the text of many of Delaware's constitutional provisions, including Article I, Section 11, predate the United States Constitution itself.[276]

The delay in applying the Eighth Amendment to the states makes that logic all the more compelling.

### b.   Different Constitutional Provisions

A second distinction between the Delaware and federal constitutions is their different content. Unlike the U.S. Constitution, the Delaware Constitution contains the Right-to-a-Remedy Clause and vests this court exclusively with equitable

---

[275] *Robinson*, 370 U.S. 660.

[276] *Sanders*, 585 A.2d at 145 n.24.

jurisdiction. As discussed in the Threshold Opinion,[277] those provisions call for the courts of Delaware to take a more assertive approach in protecting state constitutional rights.

Article I, Section 9 of the Delaware Constitution contains a constitutional commitment that "every individual for an injury done to the individual[] . . . shall have remedy."[278] As discussed in the Threshold Opinion, the Delaware Supreme Court has given the Right-to-a-Remedy Clause meaningful content.

> It is the duty of the courts to afford a remedy and redress for every substantial wrong. Part of our basic law is the mandate that "every man for an injury done him in his . . . person . . . shall have remedy by the due course of law . . . ." Neither volume of cases, nor danger of fraudulent claims, nor difficulty of proof, will relieve the courts of their obligation in this regard.[279]

The justices admonished that "if there be increased litigation, the courts must willingly cope with the task."[280] To be sure, the clause does not require courts to invent causes of action unknown at common law,[281] but that admonition does not apply to a constitutional right.

---

[277] *Threshold Op.*, 2026 WL 2082677, at *36–39.

[278] Del. Const. art. I, § 9.

[279] *Robb v. Pa. R.R. Co.*, 210 A.2d 709, 714 (Del. 1965) (citation omitted); *accord* Holland, *Delaware State Constitution*, *supra*, at 65 ("Under this Section, the courts have a duty to afford a remedy for every substantial wrong; the volume of cases, danger of fraudulent claims, or difficulty of proof do not eliminate this requirement.").

[280] *Robb*, 210 A.2d at 714.

[281] *Alfree v. Alfree*, 410 A.2d 161, 163 (Del. 1979), *abrogated on the merits by Beattie v. Beattie*, 630 A.2d 1096 (Del. 1993).

As discussed in the Threshold Opinion, the Delaware Constitution also vests this court exclusively with equitable jurisdiction.[282] By creating this court, the framers "intended to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity."[283] That jurisdictional grant gives this court an expansive power "to meet new exigencies"[284] and "changing needs."[285]

The U.S. Constitution does not contain similar provisions. The presence of these provisions in the Delaware Constitution imposes a heightened duty on courts generally—and this court in particular—to provide remedies for constitutional violations.

### 5. Matters Of State Interest And Local Concern

The fifth *Hunt* factor calls on the court to consider matters of state interest and local concern. This factor cuts against lockstep interpretation and a cruel-intent requirement.

---

[282] Holland, *Delaware State Constitution*, *supra*, at 155.

[283] *DuPont v. DuPont*, 85 A.2d 724, 729 (Del. 1951).

[284] *Schoon v. Smith*, 953 A.2d 196, 206 (Del. 2008) (quoting *Story's Equity Jurisprudence* n.5, at 45 (9th ed. 1866)).

[285] *Id.* at 205 n.24 (quoting 1 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 60, at 77–78 (5th ed. 1941)).

### a.    Delaware's Interest In Maintaining State Standards And State Oversight

Delaware has a substantial interest in applying its own Cruel Punishment Clause. When rejecting lockstep interpretation for capital sentencing, the Delaware Supreme Court emphasized Delaware's distinct interests:

> Although Delaware is bound together with the forty-nine other States in an indivisible federal union, it remains a sovereign State, governed by its own laws and shaped by its own unique heritage. An examination of those laws and that heritage may, from time to time, lead to the conclusion that Delaware's citizens enjoy more rights, more constitutional protections, than the Federal Constitution extends to them. . . . Subject to the limits of the Supremacy Clause, no one would argue that our General Assembly should not legislate on subjects such as environmental protection merely because Congress has done so. Similarly, this State's judicial branch should not be foreclosed from interpreting our Constitution merely because the United States Supreme Court has interpreted similar provisions of the Federal Constitution.[286]

The justices also stressed their ability to consider "our State's popularly enacted legislation and other objective evidence of our State's standards of decency."[287] But the justices conversely observed that "[u]nlike the United States Supreme Court, however, we should not be influenced by concerns of federalism" and that neither federal decisions nor "[t]he laws and history of our sister States" were binding.[288]

---

[286] *Sanders*, 585 A.2d at 145–46.

[287] *Id.* at 146.

[288] *Id.*

Those observations carry particular weight for prison conditions. Delaware operates a unified correctional system.[289] There are no county jails or municipal lockups, and responsibility for conditions of confinement is not fragmented—as in many states—among a state corrections department, county sheriffs, and municipal governments.[290] The Department does all of its sentencing calculations in-house and treats its five levels of confinement as points along a single spectrum.[291] The federal system and other state systems do not operate the same way.

The Sentencing Accountability Commission (SENTAC) oversees Delaware's unified system. SENTAC's overarching purpose is to establish "a system which emphasizes accountability of the offender to the criminal justice system and accountability of the criminal justice system to the public."[292] SENTAC maintains sentencing guidelines with the goals of "ensuring certainty and consistency of punishment commensurate with the seriousness of the offense and with due regard for resource availability and cost."[293] SENTAC also considers, in order of priority, the goals of (1) incapacitating violence-prone offenders, (2) restoring the victim as nearly

---

[289] Taylor Tr. 87.

[290] *See id.* at 87–88.

[291] *See id.* at 88.

[292] 11 *Del. C.* § 6580(b).

[293] *Id.* § 6580(c).

100

as possible to the victim's pre-offense status, and (3) rehabilitating the offender.[294] Consistent with those goals, the Department as a whole is "extremely focused on rehabilitation and reentry."[295] Here again, the federal system and other state systems do not operate the same way.

Finally, Delaware has deviated from the national norm by forbidding privately owned detention facilities.[296] The Department also cannot hire private prison management firms, although it can contract with private entities to supply ancillary services.[297] Once more, the federal system and other state systems do not operate the same way.

As the Delaware Supreme Court explained in *Sanders*, the Supreme Court of the United States uses considerations "firmly rooted in national history" to create "*national* rules" that have "a clear *national* foundation in evolving attitudes and needs."[298] But national history, national attitudes, and national needs may fall short for Delaware. Our distinctive history and traditions call for giving the Cruel Punishment Clause independent meaning.

---

[294] *Id.*

[295] Taylor Tr. 88.

[296] *See* 11 *Del. C.* § 6593(a).

[297] *See id.* § 6593(b) (defining ancillary services to include "medical services, food service, educational services, or facility repair and maintenance").

[298] *Sanders*, 585 A.2d at 145 (emphases in original).

### b. Delaware's Interest In Not Following Shifting Federal Precedent

An equally important consideration for Delaware is not being shackled to shifting federal precedent. Commentators of all stripes—liberal and conservative, originalist and living constitutionalist—have criticized federal Eighth Amendment jurisprudence as "markedly inconsistent both in terms of substantive limits and procedural requirements,"[299] "notoriously unclear and inconsistent,"[300]

---

[299] Erwin Chemerinsky, *The Constitution and Punishment*, 56 Stan. L. Rev. 1049, 1051 (2004); *see* Sara Mayeux, *Youth and Punishment at the Roberts Court*, 21 U. Pa. J. Const. L. 543, 558 (2018) ("[T]he Justices do not even seem to adhere consistently to their own explicitly stated overarching principles in Eighth Amendment cases.").

[300] Ian P. Farrell, *Strict Scrutiny Under the Eighth Amendment*, 40 Fla. St. U. L. Rev. 853, 858 (2013); *see* Stinneford, *Unusual, supra*, at 1740 (stating that "legal scholars and the American public have become aware that something is not quite right with the Supreme Court's Eighth Amendment jurisprudence" and explaining that "[t]he feeling that modern Eighth Amendment jurisprudence has gone off the rails has arisen, at least in part, from the wildly inconsistent rulings that have emanated from the Supreme Court over the past few decades, particularly regarding proportionality in sentencing and the death penalty").

"fundamentally incoherent,"[301] "mangled and disjointed,"[302] "simply a mess,"[303] and a "train wreck."[304] Some justices have echoed those characterizations.[305]

Eighth Amendment jurisprudence on prison conditions has generated its fair share of discontent, particularly for requiring subjectively cruel intent. In 1976,[306] a five-justice majority held that an Eighth Amendment challenge to prison conditions requires an "inquiry into a prison official's state of mind."[307] The majority reasoned

---

[301] Justin Driver & Emma Kaufman, *The Incoherence of Prison Law*, 135 Harv. L. Rev. 515, 522 (2021); *accord* Youngjae Lee, *The Constitutional Right Against Excessive Punishment*, 91 Va. L. Rev. 677, 684 (2005) (describing Eighth Amendment jurisprudence as "ineffectual and incoherent").

[302] Joshua L. Shapiro, And *Unusual: Examining the Forgotten Prong of the Eighth Amendment*, 38 U. Mem. L. Rev. 465, 467 (2008) (emphasizing capital punishment caselaw).

[303] Meghan J. Ryan, *Taking Dignity Seriously: Excavating the Backdrop of the Eighth Amendment*, 2016 U. Ill. L. Rev. 2129, 2131; *accord* Velloze, *supra*, at 33 (describing Eighth Amendment jurisprudence as "a messy modern doctrine largely divorced of any precise or determinate principles"); Stacy, *supra*, at 476 (characterizing Eighth Amendment caselaw as a "mess").

[304] Benjamin Wittes, *What Is "Cruel and Unusual"?*, Pol'y Rev., Dec. 2005–Jan. 2006 ("The Eighth Amendment is a jurisprudential train wreck. . . . The Supreme Court's case law has left the amendment without coherent meaning. No principle guides its reach.").

[305] *See Kennedy v. Louisiana*, 554 U.S. 407, 437 (2008) (describing death penalty caselaw as "still in search of a unifying principle"); *Montgomery v. Louisiana*, 577 U.S. 190, 223 (2016) (Scalia, J., dissenting) (criticizing the "ever-moving target of impermissible *punishments*" (emphasis in original)); *Miller v. Alabama*, 567 U.S. 460, 514 (2012) (Alito, J., dissenting) (describing Eighth Amendment caselaw as "no longer tied to any objective indicia of society's standards" and "entirely inward looking").

[306] *Estelle*, 429 U.S. 97.

[307] *Wilson v. Seiter*, 501 U.S. 294, 299 (1991).

103

that if a condition of confinement "is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify."[308] The majority explained that to meet the knowledge requirement, a prisoner had to show "deliberate indifference" to the condition and that the offending conduct was "wanton," judged not by the effects on the prisoner but from the perspective of the prison official.[309]

Four justices objected to the intent requirement as "a departure from precedent" and argued for examining only a condition's "objective severity."[310] Those justices expressed concern that a subjective standard would prove "impossible to apply in many cases" because "[i]nhumane prison conditions often are the result of cumulative actions and inactions by numerous officials," and "it is far from clear whose intent should be examined."[311]

Those concerns failed to persuade the majority. In 1994, the Court confirmed that the deliberate indifference test requires subjective knowledge, holding that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts

---

[308] *Id.* at 300 (emphasis in original).

[309] *Id.* at 303.

[310] *Id.* at 309–10 (White, J., concurring).

[311] *Id.* at 310 (White, J., concurring).

from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference."[312]

Many commentators oppose the intent-based standard.[313] They have noted

that under its terms, if a responsible prison official is not actually aware that a policy

or action subjects an inmate to a serious risk of harm, then there is no constitutional

violation, regardless of how foreseeable the cruel consequences may be.[314] They have

observed that an intent requirement makes little sense in modern prisons that

---

[312] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Justices Blackmun and Stevens continued to object to the subjective standard. *See id.* at 851 (Blackmun, J., concurring) ("[I]nhumane prison conditions violate the Eighth Amendment even if no prison official has an improper, subjective state of mind."); *id.* at 858 (Stevens, J., concurring) ("I continue to believe that a state official may inflict cruel and unusual punishment without any improper subjective motivation[.]").

[313] *E.g.*, Malina J. Simard-Halm, *The Unknowns of the Knowledge Requirement: Revisiting the Deliberate Indifference Standard in Prisoner Healthcare*, 115 J. Crim. L. & Criminology 715 (2025); Sharon Dolovich, *The Coherence of Prison Law*, 135 Harv. L. Rev. F. 301 (2022); Nicole B. Godfrey, *Institutional Indifference*, 98 Or. L. Rev. 151 (2020); Margo Schlanger, *The Constitutional Law of Incarceration, Reconfigured*, 103 Cornell L. Rev. 357 (2018); Brittany Glidden, *Necessary Suffering?: Weighing Government and Prisoner Interests in Determining What Is Cruel and Unusual*, 49 Am. Crim. L. Rev. 1815 (2012); Sharon Dolovich, *Cruelty, Prison Conditions, and the Eighth Amendment*, 84 N.Y.U. L. Rev. 881 (2009); Alice Ristroph, *State Intentions and the Law of Punishment*, 98 J. Crim. L. & Criminology 1353 (2008); James J. Park, *Redefining Eighth Amendment Punishments: A New Standard for Determining the Liability of Prison Officials for Failing to Protect Inmates from Serious Harm*, 20 Quinnipiac L. Rev. 407 (2001); *but see* Ann Woolhandler & Michael Collins, *Inmate Constitutional Claims and the Scienter Requirement*, 98 Wash. U. L. Rev. 645, 648 (2020) (arguing "that state-of-mind requirements are more justified than critics claim").

[314] *See, e.g.*, Stinneford, *Cruel*, *supra*, at 458.

function as large bureaucracies with highly compartmentalized actors.[315] They have argued that the intent requirement creates arbitrary distinctions between prisoners who suffer the same harm, because the only prisoners who can state a constitutional claim are those fortunate enough (in an ironic sense) to suffer at the hands of a malevolent or reckless jailer.[316] And they have posited that the test creates a perverse incentive toward willful blindness, because only actual knowledge supports a constitutional violation.[317]

Federal decontamination jurisprudence is even more confused, because different federal courts analyze decontamination-related challenges under different standards. Some use deliberate indifference.[318] Others treat a lack of

---

[315] *See, e.g.*, *id.* at 499.

[316] *See, e.g.*, *id.* at 501.

[317] *See, e.g.*, *id.* For simplicity, this decision has cited Stinneford's versions of these observations. Similar objections appear throughout the literature criticizing the subjective test.

[318] *See, e.g.*, *Moskos v. Hardee*, 24 F.4th 289, 293–94 (4th Cir. 2022) (prisoner brought excessive force claim involving OC spray and deliberate indifference claim involving lack of decontamination); *Iko v. Shreve*, 535 F.3d 225, 238–43 (4th Cir. 2008) (same); *Ivery v. W. Va. Div. of Corr. & Rehab.*, 2024 WL 1468935, at *2 (S.D.W. Va. Apr. 4, 2024) (same); *Saunders v. Burton*, 2022 WL 8299859, at *8, *16 (S.D.W. Va. June 17, 2022) (same), *report and recommendation adopted*, 2022 WL 4484012 (S.D.W. Va. Sept. 27, 2022). Some federal courts use the deliberate indifference framework exclusively. *Allen v. Mills*, 2018 WL 6171436, at *7 (E.D. Mo. Nov. 26, 2018) ("The Eighth Circuit has clarified that the failure to permit a prisoner to wash off pepper spray invokes the 'deliberate indifference' standard and not the 'malicious and sadistic' because a 'delayed decontamination claim . . . is not an excessive force claim.'" (quoting *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014))).

decontamination as an excessive force claim.[319] The excessive-force test goes beyond deliberate indifference to require proof that a prison official applied force "maliciously and sadistically to cause harm."[320]

Those are obviously different standards,[321] and the federal courts have yet to develop principles for determining when each applies. As a result, similar incidents

---

[319] *See, e.g.*, *Danley v. Allen*, 540 F.3d 1298, 1308 (11th Cir. 2008) (holding that the "initial pepper spraying itself was not excessive force" but "under the facts alleged in the complaint, [the officers] acted 'maliciously and sadistically for the very purpose of causing harm,' [which] is supported by their actions after they made Danley's suffering worse by confining him in the small, pepper spray-filled cell" (quoting *Whitley*, 475 U.S. at 320–21)), *overruled in part on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see id.* at 1308–09 ("Although less common than the direct application of force, subjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions—here, the pepper spray lingering in the air and on him—can constitute excessive force. . . . Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need."); *Thomas v. Thomas*, 2023 WL 2938369, at *1 & n.1 (S.D. Ga. Apr. 13, 2023) (analyzing failure to decontaminate as excessive force claim), *report and recommendation adopted*, 2023 WL 3321739 (S.D. Ga. May 9, 2023); *Wagner v. Warden*, 2016 WL 7178297, at *10 (D. Md. Dec. 8, 2016) (stating that "[c]ourts have also concluded that the Eighth Amendment can be violated when, after a prisoner is subjected to pepper spray, even for a legitimate reason, officers then withhold appropriate medical attention" and collecting three cases evaluating claims based on a lack of decontamination as excessive force claims: *Walker v. Bowersox*, 526 F.3d 1186, 1189 (8th Cir. 2008), *Norton v. City of Marietta*, 432 F.3d 1145, 1153–54 (10th Cir. 2005) (per curiam), and *Foulk v. Charrier*, 262 F.3d 687, 692, 701–02 (8th Cir. 2001)); *see also Williams v. Benjamin*, 77 F.3d 756, 770 (4th Cir. 1996) (affirming that initial use of mace was not excessive force but reversing and remanding grant of summary judgment on excessive force claim based on officials' refusal to allow prisoner to wash and denial of medical attention).

[320] *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).

[321] *Farmer*, 511 U.S. at 837–39; *Whitley v. Albers*, 475 U.S. 312, 320 (1986); *see Williams*, 77 F.3d at 761 (describing the subjective component of an excessive force claim as more "rigorous" than that of a deliberate indifference claim); *id.* ("[A]n

can be analyzed differently, generate different outcomes, and create confusion over what decontamination-related conduct violates the Eighth Amendment.[322] Further complicating matters, many decontamination-related claims seek damages, where immunity defenses predominate.[323]

By giving the Cruel Punishment Clause independent meaning, the Delaware courts determine what constitutes cruel punishment north of the Transpeninsular Line, east of the Tangent Line, west of the low tide mark of the Delaware River's New Jersey shore, south of the Twelve Mile Arc, and inside the Wedge. Delaware courts can focus on Delaware's unique traditions and needs rather than the diverse demands of a multi-jurisdictional nation. In pursuing that narrower mandate, the Delaware

---

inmate asserting an excessive force claim is thus required to meet this *more* demanding standard with regard to the subjective component of Eighth Amendment analysis . . . ." (emphasis in original)).

[322] In *Segrain*, for example, officers left a sprayed prisoner in a holding cell with his hands handcuffed behind his back and his face wet with pepper spray for approximately thirteen minutes. The prisoner cited cases to support his argument that a reasonable jury could find that the decontamination delay constituted an Eighth Amendment excessive force violation. The officials cited cases going the other way, including a challenge to decontamination under a deliberate indifference claim. The First Circuit observed that the officials' "cases involve distinguishable factual circumstances and/or legal standards," but "they are relevant to some extent and suggest some degree of uncertainty in the legality of the alleged delay in Segrain's decontamination." *Segrain v. Duffy*, 118 F.4th 45, 69 (1st Cir. 2024).

[323] *See, e.g.*, *id.* at 68–69 (declining to reach the constitutional issue, reasoning that the officers were entitled to qualified immunity because "the law in this area was not 'sufficiently clear that every reasonable official would understand that' a delay in decontamination" from pepper spray "for the length of time Segrain alleges constituted an Eighth Amendment violation" (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018))).

Supreme Court can craft a more consistent, comprehensible, and locally applicable body of law.

### 6.    State History And Tradition

The sixth *Hunt* factor calls for considering state history and tradition. Delaware has a history and tradition of interpreting its constitution as having independent meaning.

The Delaware Supreme Court has often given independent content to provisions in the Delaware Constitution.[324] That has been particularly true for

---

[324] *See, e.g., Doe*, 88 A.3d at 665 (finding Delaware's right to keep and bear arms found in Article I, Section 20 of the Delaware Constitution grants broader rights than the Second Amendment of the U.S. Constitution); *Dorsey*, 761 A.2d at 821 (holding that Article I, Section 6 of the Delaware Constitution provides greater rights against unlawful searches and seizures than the Fourth Amendment of the U.S. Constitution); *Jones*, 745 A.2d at 865–66, 873–74 (same); *E. Lake Methodist Episcopal Church, Inc. v. Trs. of Peninsula-Del. Annual Conf. of the United Methodist Church, Inc.*, 731 A.2d 798, 805 n.2 (Del. 1999) (interpreting Article I, Section 1 of the Delaware Constitution differently than the First Amendment of the U.S. Constitution); *Gannon v. State*, 704 A.2d 272, 277 (Del. 1998) (interpreting Article I, Section 14 differently than the federal Confrontation Clause); *Claudio*, 585 A.2d at 1298 (holding that Article I, Section 4 of the Delaware Constitution provides a greater right to trial by jury in a criminal matter than the Sixth Amendment of the U.S. Constitution); *Bryan v. State*, 571 A.2d 170, 176–77 (Del. 1990) (holding that Article I, Section 7 of the Delaware Constitution provides a greater right to counsel than the Fifth Amendment of the U.S. Constitution); *Hammond v. State*, 569 A.2d 81, 87 (Del. 1989) (holding that Article I, Section 7 of the Delaware Constitution provides greater protections in the preservation of exculpatory evidence than the Fourteenth Amendment of the U.S. Constitution); *Van Arsdall v. State*, 524 A.2d 3, 6–7 (Del. 1987) (holding that Article I, Section 7 of the Delaware Constitution contemplated a greater right of confrontation than the Sixth Amendment of the U.S. Constitution); *see also Fortt v. State*, 766 A.2d 475, 477 (Del. 2000) (per curiam) ("While the analysis may be the same under either the federal or state [double jeopardy] provision, Delaware's distinct common law roots developed prior to the adoption of the Fifth Amendment of the Federal constitution do not preclude a separate analysis in given

provisions which, like the Cruel Punishment Clause, appear in Delaware's Declaration of Rights.[325] The justices have emphasized that

> [t]he Declaration of Rights in the Delaware Constitution is not a mirror image of the federal Bill of Rights. Consequently, Delaware judges cannot faithfully discharge the responsibilities of their office by simply holding that the Declaration of Rights in Article I of the Delaware Constitution is necessarily in "lock step" with the United States Supreme Court's construction of the federal Bill of Rights.[326]

The death penalty illustrates Delaware's tradition of independence. At the federal level, the death penalty remains constitutional under the Eighth Amendment. In 2016, the Delaware Supreme Court held that the state's death penalty statute was unconstitutional.[327]

Delaware's tradition of interpreting its constitution independently rests on a strong belief in federalism. "The Framers of the United States Constitution adopted a constitutionally mandated balance of power between the States and the Federal Government . . . to ensure the protection of our fundamental liberties."[328] "The preservation of diversity in the legal and governmental systems of each state was

---

circumstances without reference to the federal counterpart."); *Lolly v. State*, 611 A.2d 956, 959–60 (Del. 1992) (declining to follow federal due process cases and holding that bad faith by the police in failing to preserve exculpatory evidence is not a prerequisite to a lack of due process under the Delaware Constitution).

[325] *See generally* Holland, *Delaware State Constitution*, *supra*, at 32–34.

[326] *Dorsey*, 761 A.2d at 814 (footnote omitted).

[327] *Rauf v. State*, 145 A.3d 430, 433–34 (Del. 2016).

[328] *Jones*, 745 A.2d at 874 (internal quotation marks omitted).

expressly contemplated when the United States Constitution was framed and adopted."[329] Consequently, "[t]he Delaware Constitution, like the constitutions of certain other states, may provide individuals with greater rights than those afforded by the United States Constitution."[330] The Supreme Court of the United States has acknowledged this basic principle.[331]

In the corrections area, Delaware has traditions that have diverged from national norms. On the one hand, Delaware was the last in the nation to discard whipping; the General Assembly did not eliminate it until 1972. Although Delaware Supreme Court decisions from the 1960s interpreted the Cruel Punishment Clause as having independent content that departed from the Eighth Amendment, they did so (regrettably and incorrectly in my view) in a manner that departed from its distinct text and original meaning. Starting with *Sanders*, that began to change.

On the other hand, in recent decades Delaware has made important strides. The Commissioner testified that the Department she leads "is not the same department today that it was 28 years ago when I started."[332] The political branches

---

[329] *Id.*

[330] *Id.* at 863. *See generally* Myron T. Steele & Peter I. Tsoflias, *Realigning the Constitutional Pendulum*, 77 Alb. L. Rev. 1365 (2014).

[331] *California v. Ramos,* 463 U.S. 992, 1013–14 (1983) ("It is elementary that States are free to provide greater protections . . . than the Federal Constitution requires.").

[332] Taylor Tr. 88.

111

took the initiative after an uprising in 2017 at the James T. Vaughn Correctional Center where a correction officer was killed,[333] and Delaware promptly addressed conditions there through a state-level independent review commission and the implementation of meaningful reforms. The Department is also one of only six state correction agencies to have every facility fully accredited through the American Correctional Association.[334]

These distinct state traditions illustrate Delaware's history of distinguishing itself from the correctional norms of the federal government and the country at large. They counsel in favor of giving independent meaning to the Cruel Punishment Clause.

### 7. Public Attitudes

The last *Hunt* factor calls on the court to consider public attitudes, because "[d]istinctive attitudes of a state's citizenry may . . . furnish grounds to expand constitutional rights" under a state charter.[335] For purposes of criminal law, one indication of current public attitudes toward punishment is the absence of popular

---

[333] *See id.* at 163.

[334] *Id.* at 129. To flag one issue *sua sponte* without addressing it, it seems possible that the American Correctional Association could have policies addressing OC decontamination that could be pertinent to the plaintiffs' claims. That is not to suggest that the Cruel Punishment Clause enacts best practices, but accreditation standards could be relevant to a proportionality inquiry. If any policies exist and are probative, they can be presented at trial.

[335] *Jones*, 745 A.2d at 865.

outcry to the Delaware Supreme Court's 2016 decision holding the state's death penalty statute unconstitutional. Instead, in 2024, the General Assembly enacted and the Governor signed legislation officially repealing the death penalty and replacing it with the sentence of life in prison without the possibility of parole.[336]

An indication of Delaware's public attitudes toward cruelty is a proposed definition adopted by the Delaware General Assembly's Criminal Justice Improvement Committee.[337] Under that definition, "cruelty" means "any act or omission whereby unnecessary or unjustifiable physical pain, suffering, or death is caused or permitted."[338] Cruel intent is not required. The General Assembly has not yet adopted a statutory definition of cruelty, but the Committee's definition remains instructive. Cruel intent is again not required.[339]

---

[336] 11 *Del. C.* § 4209.

[337] The Working Group's members were Adam L. Balick, Judge William C. Carpenter, Robert Goff, Ipek Kurul Medford, Lisa Minutola, Ret. Colonel Elmer Setting, Chief Justice Leo E. Strine, Jr., and Judge Ferris W. Wharton. *See* Del. Crim. Just. Improvement Comm., 1 *Final Report to the Delaware General Assembly's Criminal Justice Improvement Committee: Improved Code Text* (Mar. 22, 2019).

[338] *Id.* at 5.

[339] The General Assembly has defined "cruel" for purposes of cruelty against animals. Under the animal cruelty statute, "'[c]ruel' includes every act or omission to act whereby unnecessary or unjustifiable physical pain or suffering is caused or permitted." 11 *Del. C.* § 1325(a)(3). "'[C]ruel mistreatment' includes any treatment whereby unnecessary or unjustifiable physical pain or suffering is caused or permitted." *Id.* § 1325(a)(4). The *crime* of cruelty to animals requires *mens rea* and occurs when a person "intentionally or recklessly" engages in cruel mistreatment, cruel neglect, or other identified acts. *Id.* § 1325(b). The definitions of "cruel" and "cruel mistreatment," however, do not require cruel intent. If unnecessary or

### 8. Summing Up

The *Hunt* factors weigh decisively against a lockstep interpretation of the Cruel Punishment Clause that would require a showing of cruel intent. To establish a constitutional violation, the Cruel Punishment Clause only requires a showing of cruel effect.

## B. The Cruel Punishment Clause And This Case

Concluding that the Cruel Punishment Clause has independent content and does not require a showing of cruel intent still requires translating those concepts into a legal test. This decision proposes that a condition of confinement violates the Cruel Punishment Clause when it (1) exposes the prisoner to an objectively significant risk of serious harm and (2) is not reasonably necessary to accomplish the goals of rehabilitation, deterrence, or incapacitation.

### 1. The Washington State Model

The Supreme Court of Washington has blazed a trail by explaining why rejecting the federal standard is warranted and adopting an alternative test. This decision finds Washington's approach persuasive.

---

unjustifiable physical pain or suffering is "cruel" when inflicted on animals, surely it remains so when inflicted on humans.

### a. Independent Content

Like Delaware, Washington uses factors drawn from *Hunt* to determine whether to give one of its constitutional provisions independent meaning.[340] As with the analysis that this decision has conducted, the Supreme Court of Washington applied a comparable set of factors to conclude that Washington's cruel punishment clause carried independent meaning that is more protective than the Eighth Amendment.

- Text: The Washington Constitution bans "cruel punishment" and omits the words "and unusual."[341] The Supreme Court of Washington held that this difference is "material and supports a more expansive interpretation."[342] Delaware's Cruel Punishment Clause exhibits the same textual difference.[343]

- Legislative History: The history of the Washington Constitution suggests its framers intended to enshrine a more protective approach than the Eighth Amendment, as evidenced by other clauses in the Washington Constitution.[344] The Delaware Constitution contains similarly aligned provisions, including the Prisoner Health Clause, the Right-to-a-Remedy Clause, and the vesting of equity jurisdiction exclusively in the Court of Chancery.[345]

---

[340] Washington courts call them the *Gunwall* factors after the case that adopted them. *See State v. Gunwall*, 720 P.2d 808, 810–13 (Wash. 1986) (adopting six factors drawn from law review articles and *Hunt*).

[341] Washington's constitution states: "Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted." Wash. Const. art. I, § 14.

[342] *Williams*, 496 P.3d at 297; *accord State v. Bassett*, 428 P.3d 343, 349 (Wash. 2018); *State v. Fain*, 617 P.2d 720, 723 (Wash. 1980).

[343] *See supra* Section IV.A.1.

[344] *Williams*, 496 P.3d at 297–98.

[345] *See supra* Section IV.A.4.b.

- State Law: Unlike the federal government, Washington prohibits private prisons and detention centers, suggesting a different orientation.[346] Delaware also prohibits private prisons, and the Department cannot contract with private providers except for ancillary services.[347] Washington also recognizes that punishments can become cruel if there is a change in circumstances,[348] a determination Delaware has also made.[349]

- Structural Differences: The Supreme Court of Washington distinguishes between the U.S. Constitution's status as "a grant of limited power authorizing the federal government to exercise only constitutionally enumerated powers," in contrast with "the plenary power of the State to act in any way not forbidden by the state constitution or federal law."[350] The Delaware Supreme Court draws the same distinction.[351]

- Matters of Particular State Interest or Local Concern: The Supreme Court of Washington regards its state penitentiaries as a matter of distinct local concern.[352] This decision has reasoned that Delaware should do the same.[353]

---

[346] *Williams*, 496 P.3d at 299 (*citing* 2021 Wash. Sess. Laws ch. 30, § 3).

[347] *See supra* Section IV.A.5.a.

[348] *Williams*, 496 P.3d at 299–300.

[349] *See Robertson*, 54 A.2d at 850 (holding that transferring a prisoner from one facility to another would not violate the Cruel Punishment Clause, but that the prisoner could challenge the new conditions of confinement); *see also Cannon II*, 196 A.2d at 400–01 (holding that where pre-sentence report indicated that the prisoner was possibly mentally unstable and whipping might have a far-reaching and unwarranted adverse effect on him, a sentence involving whipping could be constitutionally excessive and remanding so that the parties could create a factual record on that issue).

[350] *Williams*, 496 P.3d at 300.

[351] *See supra* Section IV.A.4.a.

[352] *Williams*, 496 P.3d at 300–01.

[353] *See supra* Sections IV.A.5.a & IV.A.6.

Based on those factors, the Supreme Court of Washington held that "in the context of prison conditions, which includes prisoners' health and welfare, Washington's cruel punishment clause provides greater protection than its federal counterpart."[354] That analysis resembles this decision's analysis of the *Hunt* factors and its conclusion that the Cruel Punishment Clause provides greater protection than the Eighth Amendment.

### b. The Inadequacies Of The Federal Test

The Supreme Court of Washington next rejected the federal standard for challenges to prison conditions as inadequate to enforce Washington's cruel punishment clause. In lieu of a test with a subjective component, the Supreme Court of Washington adopted a purely objective test.

The Supreme Court of Washington began by summarizing the federal standard. To reiterate, under the Eighth Amendment test, "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"[355]

---

[354] *Williams*, 496 P.3d at 301.

[355] *Id.* at 302 (quoting *Farmer*, 511 U.S. at 837). The Supreme Court of Washington was not addressing a use-of-force scenario, so the court did not discuss the more stringent intent requirement that governs a challenge to the use of force and which some federal courts have extended to cover prison conditions—like a failure to decontaminate—that result from the use of force. *See supra* Section IV.A.5.b (discussing federal caselaw).

Like the scholars who have objected to the federal test,[356] the Supreme Court of Washington identified the federal test's many shortcomings. The Washington justices noted that the federal test mistakenly assumes that conditions of confinement qualify as punishment "only if they are subjectively intended as punishment by an identifiable prison official."[357] The Washington justices explained that "conditions of confinement are inherently part of the punishment imposed on prisoners. But for their conviction and sentence, prisoners would not be confined or subject to the attendant conditions of confinement."[358]

---

[356] *See supra* Section IV.A.5.b.

[357] *Williams*, 496 P.3d at 302 (citing *Wilson*, 501 U.S. at 300 ("If the pain inflicted [by a condition of confinement] is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify" as punishment under the Eighth Amendment)).

[358] *Id.* at 303; *accord* Stinneford, *Confinement, supra*, at 13 n.12 ("[P]rison conditions are part of the punishment the offender receives with his sentence."); Mirko Bagaric & Sandeep Gopalan, *Sound Principles, Undesirable Outcomes: Justice Scalia's Paradoxical Eighth Amendment Jurisprudence*, 50 Akron L. Rev. 301, 345 (2016) ("[T]he prisoner is institutionalized solely *because of* the crime. Hence, there is a strong argument that punishment consists of all deprivations experienced by the prisoners which foreseeably stem from the incarceration. This extends to compromised health care and beatings by staff, but not, for example, to an injury sustained due to an earthquake that damaged the prison. Accordingly, deprivations experienced by inmates which are a foreseeable incident of their confinement do fall within the meaning of punishment. All such hardships should be factored into an assessment of whether treatment is cruel and thus a violation of the Eighth Amendment. The contrary position adopted by Justice Scalia and the majority of the Court is flawed. Therefore, the subjective limb of the test for whether treatment of prisoners is cruel should be abolished." (emphasis in original)). The federal intent requirement also creates a different constitutional problem. "Basic separation of powers principles dictate that only the legislature may authorize punishments and only the judge or the jury may impose them. Executive officials are supposed to

Like the scholars who have criticized the federal test, the Washington justices also observed that "cruel conditions of confinement can result from institutional policies and practices just as readily as from intentional acts by individual prison officials."[359] Conditions may result from a combination of decisions at different levels, with no single person bearing the level of knowledge or responsibility that the federal test contemplates. The Washington justices concluded that "[w]hether prison conditions deprive prisoners of basic human dignity intentionally or incidentally, Washington's constitution prohibits such treatment."[360]

The Washington justices further observed that those flaws and others permit problematic conditions of confinement to persist in the federal system, even when

---

implement the punishments authorized by the other branches of government. They do not have the authority to enhance punishments on their own." Stinneford, *Confinement, supra*, at 13. Relatedly, the federal test errs by prioritizing punitive intent over punitive effect, even though the latter is the most intuitively important factor for evaluating a punishment. If a warden responded to a prison disturbance by flogging prisoners or by extending the sentences, those consequences would constitute additional punishment, even if the warden subjectively believed that the responses were administrative steps necessary to manage prison operations. *Id.* at 11.

[359] *Williams*, 496 P.3d at 302 (citing *Wilson*, 501 U.S. at 300 (White, J., concurring in the judgment) ("Inhumane prison conditions often are the result of cumulative actions and inactions by numerous officials inside and outside a prison, sometimes over a long period of time. In those circumstances, it is far from clear whose intent should be examined . . . . In truth, intent simply is not very meaningful when considering a challenge to an institution, such as a prison system.")); *see* Simard-Halm, *supra*, at 760 (explaining that many officials interact with and take care of a prisoner, and the institutional knowledge and responsibility may be split among them); Dolovich, *supra*, at 925 (same).

[360] *Williams*, 496 P.3d at 303.

unquestionably cruel, so long as the prison officials involved in the practice either did not make the decision to impose it, were ignorant of its consequences, or merely had good intentions.[361] The federal test thus prioritizes protecting prison officials and the state fisc over correcting constitutional violations. In doing so, it shifts the cost of prison violations from the state to the individual prisoners who must bear them. As the Washington justices explained, giving *scienter*-based protection to prison officials might make sense when prisoners seek to recover damages, as they often do in federal court. But in Washington state court, prisoners generally seek declaratory or injunctive relief that will cause "an institutional change to remedy an unconstitutional action or condition."[362] For purposes of Washington's constitutional regime, the *scienter*-based standard would interfere with courts' ability to remedy constitutional violations.[363]

Finally, the Washington justices explained that the federal intent-based standard conflicts with the text and legislative history of the Washington cruel punishment clause. As they concluded, nothing in either the text or the legislative

---

[361] *Id.* at 302; *see Farmer*, 511 U.S. at 844 (acknowledging that prison officials can avoid liability for otherwise constitutionally violative conditions if they "prove that they were unaware even of an obvious risk to inmate health or safety . . . or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent").

[362] *Williams*, 496 P.3d at 302.

[363] *Id.*

history suggested that a constitutional violation would depend on "the subjective knowledge or intent of particular prison officials."[364]

That reasoning applies equally to Delaware and this case.

### c. Washington's Alternative Test

Having rejected the federal approach, the Supreme Court of Washington adopted a test of its own. The court held that to prevail on a challenge to prison conditions under Washington's cruel punishment clause, a prisoner "must demonstrate that (1) those conditions create an objectively significant risk of serious harm or otherwise deprive the petitioner of the basic necessities of human dignity and (2) those conditions are not reasonably necessary to accomplish any legitimate penological goal."[365]

The Washington justices explained that the first element of the test is objective and recognizes that unconstitutionally cruel conditions can arise from institutional policies and practices without requiring malicious action by individual officials. The second element of the test is also objective, but it acknowledges that legitimate penological interests can justify some harsh conditions that might otherwise be cruel. The court cited the health and safety of the prison population as countervailing interests that could provide condition-specific justifications. Yet the court admonished that when a condition creates an objectively significant risk of serious

---

[364] *Id.* at 302–03.

[365] *Id.* at 301.

harm, it must be justified as reasonably necessary to accomplish one of the legitimate penological goals of retribution, deterrence, incapacitation, or rehabilitation.[366]

## 2. The Cruel Conditions Test

The Supreme Court of Washington has articulated a persuasive test for evaluating whether prison conditions are cruel. Delaware's unique history and traditions call for a modified version of the Washington test, which this decision labels the "Cruel Conditions Test."

The text of the Cruel Punishment Clause, its legislative history, and Delaware's unique traditions and interests demonstrate that the Cruel Punishment Clause bars objectively cruel punishment. As suggested by the Prisoner Health Clause, and as Delaware recognized in 1947,[367] punishment necessarily includes the conditions of confinement. A prisoner can therefore challenge a condition under the Cruel Punishment Clause if it creates an objectively significant risk of serious harm.

Identifying that category of condition, however, does not end the inquiry. As the Supreme Court of Washington explained, some risk-creating conditions can be justified by legitimate penological interests. Consequently, if a prisoner identifies a condition that creates an objectively significant risk of serious harm, then that condition can be justified if it is shown to be reasonably necessary to achieve a legitimate penological objective. In application, the prisoner should first come

---

[366] *See id.* at 303–04.

[367] *Robertson*, 54 A.2d at 850.

forward with reasons why the condition does not serve a legitimate penological objective. The burden should then shift to the Department to show that the condition is reasonably necessary to achieve a legitimate penological objective.

At the federal level, the Supreme Court of the United States permits states to justify punishments based on retribution, deterrence, incapacitation, and rehabilitation.[368] Delaware's Cruel Punishment Clause is the direct descendant of Pennsylvania's cruel punishment clause and must be read in light of that history. The drafters of the Pennsylvania clause sought to eliminate retribution as a justification for punishment, prioritize rehabilitation and deterrence, and eliminate sanguinary, pain-based punishments.[369] Under the leadership of John Dickinson and

---

[368] *E.g.*, *Kennedy*, 554 U.S. at 420 ("[P]unishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution."); *Ewing v. California*, 538 U.S. 11, 25–31 (2003) (plurality opinion) (upholding sentence of twenty-five years to life for recidivist convicted of shoplifting because the punishment furthered the state's interest in deterrence and incapacitation); *see Enmund v. Florida*, 458 U.S. 782, 798 (1982) (holding the death penalty unconstitutional in certain felony murder cases because it did not "measurably contribute[]" to the goals of retribution and deterrence); *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) ("The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders."); *see also Harmelin*, 501 U.S. at 999 (Kennedy, J., concurring in part and concurring in the judgment) ("[T]he Eighth Amendment does not mandate adoption of any one penological theory. . . . The federal and state criminal systems have accorded different weights at different times to the penological goals of retribution, deterrence, incapacitation, and rehabilitation."); Stinneford, *Cruel*, *supra*, at 459–60 (discussing penological justifications for punishment).

[369] *See supra* Section IV.A.2.c.

123

Richard Bassett, both advocates for penal reform, the framers of Delaware's Cruel Punishment Clause inferably pursued the same goals.[370]

Delaware's history over the past five decades reflects a return to the constitutional priorities of the framers.[371] Despite the Delaware Supreme Court's failure to hold lashing unconstitutional in the early 1960s, the General Assembly abolished the whipping post in 1973.[372] In 1984, the General Assembly established SENTAC to develop sentencing guidelines "consistent with the overall goals of ensuring certainty and consistency of punishment commensurate with the seriousness of the offense and with due regard for resource availability and cost."[373] The statutory goals for sentencing do not mention retribution.[374] In 1990, *Sanders*

---

[370] *See supra* Section IV.A.2.d.

[371] Five decades is a temporally significant period for creating an established practice. Amongst an ocean of Eighth Amendment scholarship, this decision has found John Stinneford's scholarship particularly persuasive. He argues that a practice should be treated either as established or as having fallen into desuetude if it has been used or allowed to lapse for "several generations—fifty to one hundred years." John F. Stinneford, *Death, Desuetude, and Original Meaning*, 56 Wm. & Mary L. Rev. 531, 569 (2014). The principle is that the usage or non-usage must persist long enough to indicate powerfully that society has either endorsed a practice as reasonable or rejected it as unreasonable. *See id.* at 570.

[372] *See* Ayvazian, *supra*, at 143.

[373] 64 Del. Laws ch. 402, § 1 (1984), *codified at* 11 *Del. C.* § 6580.

[374] *See* 11 *Del. C.* § 6580(c).

recognized that the Cruel Punishment Clause has independent content,[375] and one commentator has suggested that post-*Sanders* cases have cracked open the door to revisiting some of the more extreme rulings from the early 1960s.[376] During the injunction hearing, the Commissioner testified credibly about the progress the Department has made during her nearly three decades with the agency,[377] including that the Department is now one of only six state correction agencies to have every facility fully accredited.[378]

In light of the text of the Cruel Punishment Clause and its legislative history, as well as Delaware's unique traditions and interests, retribution cannot serve as a legitimate penological interest for purposes of justifying a punishment or condition of confinement. Only rehabilitation, deterrence, and incapacitation are legitimate penological interests under the Cruel Punishment Clause. The Department could therefore justify an otherwise objectively dangerous condition as reasonably

---

[375] *See Sanders*, 585 A.2d at 145–47 (rejecting as "untenable" the argument that Delaware's constitution "must mean exactly the same thing as the United States Constitution" and interpreting the Cruel Punishment Clause independently).

[376] *See* Adams, *supra*, at 42 ("Recent cases suggest that the Delaware Supreme Court is open to finding a proportionality principle in [the Cruel Punishment Clause], if the case is properly and persuasively made."); *see also* Robert J. Smith et al., *State Constitutionalism and the Crisis of Excessive Punishment*, 108 Iowa L. Rev. 537, 597 (2023) ("it would make sense for the Delaware Supreme Court (and others in a similar situation) to revisit the scope of their Eighth Amendment analogues").

[377] Taylor Tr. 88.

[378] *Id.* at 129.

necessary to stop non-compliant conduct, serving the goal of incapacitation. The Department could also invoke the need to maintain a secure facility where rehabilitation can occur, therefore serving that penological goal. Or the Department could invoke the need to deter non-compliant behavior.

When evaluating whether a condition is reasonably necessary to achieve a legitimate penological goal, the court must show appropriate deference to the Commissioner's judgment. At the same time, the court must perform its independent constitutional function.

In light of the text of the Cruel Punishment Clause and its legislative history, as well as Delaware's unique traditions and interests, the Cruel Conditions Test does not require that a prison official act with cruel intent. It therefore does not require a showing of subjective knowledge, deliberate indifference, or malicious or sadistic intent.[379]

### 3. Applying The Cruel Conditions Test

It is reasonably likely that the failure to facilitate Secure Decontamination, and particularly the failure to facilitate Pre-Strip-Search Decontamination, fails the Cruel Conditions Test.

---

[379] Because the prisoners do not seek to recover damages from any official, and because it remains an open question whether Delaware would recognize a right of action for damages for violating the Cruel Punishment Clause, this decision does not consider whether some form of gross negligence standard, *scienter* requirement, or good-faith defense could be warranted in that context.

First, it is reasonably likely that the failure to facilitate Secure Decontamination, including Pre-Strip-Search Decontamination, creates an objectively significant risk of serious harm. Failure to decontaminate is dangerous and can even be lethal. It can cause eye injuries, including glaucoma, scarring, cataracts, and other long-term physical damage. It can cause lung problems, including scarring and respiratory failure, which are worsened by preexisting conditions like asthma. It can also cause skin injuries, including chemical burns and severe blistering. Indeed, several of the plaintiffs have experienced long-term health effects including prolonged pain, impaired vision, and breathing issues.[380]

---

[380] Even federal Eighth Amendment precedent supports this conclusion. This decision has already discussed the diverse results that federal courts reach when applying the Eighth Amendment to OC decontamination. Setting intent aside, the Eighth Amendment deliberate-indifference standard starts by asking whether the prisoners "face a substantial risk of serious harm." *Farmer*, 511 U.S. at 847. Although federal decisions are by no means uniform, many recognize that the "effects of prolonged exposure to pepper spray with inadequate decontamination and poor ventilation" can create a serious risk of harm. *Danley*, 540 F.3d at 1311; *see Norton*, 432 F.3d at 1154 (reversing the district court's grant of summary judgment to defendants on Eighth Amendment excessive force claim; noting that a constitutional challenge based on use of OC spray "turns in part on how long plaintiff was sprayed and whether he was adequately irrigated afterwards or left to suffer unnecessarily"); *Ivery*, 2024 WL 1468935, at *4 (crediting on a motion to dismiss that when correction officers left a contaminated prisoner in an intake cell overnight and the prisoner "was not properly decontaminated and continued to suffer the effects of the spray for days," it was "conceivable that the alleged burning of his skin, shortness of breath, and impaired vision placed him at risk of serious harm when suffered for days without decontamination"); *Saunders*, 2022 WL 8299859, at *16 ("The denial of a decontamination shower for a period of days, or even hours, after an inmate is subjected to OC spray can constitute an Eighth Amendment violation." (collecting cases)); *Brown v. Coleman*, 2021 WL 4037504, at *2 (W.D. Va. Sept. 3, 2021) (finding evidence of genuine issue of material fact for purposes of Eighth Amendment violation where the contaminated prisoner was "taken to another pod," "cleared by a

127

nurse," and "given fresh clothing," but "continued to experience different side effects until he was able to thoroughly shower . . . a week after the OC spray was applied"); *Bomar v. Wetzel*, 2020 WL 907641, at *5 (W.D. Pa. Feb. 3, 2020) ("courts have held that the failure to decontaminate prisoners or otherwise provide medical treatment for prisoners exposed to pepper spray can support a claim for a violation of the Eighth Amendment where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain" (internal quotation marks omitted) (collecting cases)), *report and recommendation adopted*, 2020 WL 906720 (W.D. Pa. Feb. 25, 2020); *Murray v. Lilly*, 426 F. Supp. 3d 245, 254–55 (S.D.W. Va. 2019) (denying summary judgment where contaminated prisoner was taken to the medical unit, placed in a shower fully clothed, and escorted to a recreation yard where his face was sprayed with water because there was "a dispute of fact as to whether he had proper opportunity to decontaminate"); *Murphy v. Ortt*, 2018 WL 1513007, at *7 (D. Md. Mar. 26, 2018) (denying summary judgment where contaminated prisoner "was placed into a cell without running water and left there for several hours still suffering from pepper spray" because genuine issue of material fact existed regarding Eighth Amendment violation); *Wagner*, 2016 WL 7178297, at *1, *9–10 (denying summary judgment where the officers "denied [the contaminated prisoner's] request for a decontamination shower and/or turned off the water in his cell"; "If the pepper spray were allowed to persist after the need for it had expired, then there would be a colorable Eighth Amendment claim for infliction of harm to plaintiff without adequate justification. Courts have also concluded that the Eighth Amendment can be violated when, after a prisoner is subjected to pepper spray, even for a legitimate reason, officers then withhold appropriate medical attention." (collecting cases)).

To be sure, other federal decisions describe the effects of OC as *de minimis*, seemingly as a matter of law, and reject failures to facilitate decontamination out of hand. *See, e.g.*, *Moskos*, 24 F.4th at 297–98; *Thomas v. McNeil*, 2009 WL 64616, at *4, *23 (M.D. Fla. Jan. 9, 2009), *aff'd sub nom. Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010); *see also Zarate v. Dep't of Just.*, 2025 WL 3618824, at *8 (E.D. Tex. Aug. 27, 2025) ("Numerous federal courts have held that the normal effects of being pepper sprayed are *de minimus* [sic]." (quoting *Vizcayno v. Michael Unit*, 2020 WL 5536504, at *9 (E.D. Tex. July 26, 2020), *report and recommendation adopted*, 2020 WL 5534579 (E.D. Tex. Sept. 14, 2020))), *report and recommendation adopted sub nom. Zarate v. Coger*, 2025 WL 3618301 (E.D. Tex. Dec. 12, 2025). The record in this case does not support either the *de minimis* assertion or a callous attitude toward failures to facilitate decontamination.

Second, it is reasonably likely that the failure to facilitate Secure Decontamination, including Pre-Strip-Search Decontamination, cannot be justified as reasonably necessary for incapacitation, deterrence, or rehabilitation. To reiterate, the plaintiffs here do not challenge the initial use of force. Using OC initially is easily justifiable as reasonably necessary for incapacitation in the sense of stopping non-compliant conduct and preventing a threat to the safety of Department personnel, other prisoners, and the non-compliant prisoner. Using OC initially is also easily justifiable as reasonably necessary for deterrence in the sense of providing a clear consequence for non-compliance that should deter prisoners from being non-compliant again. Using OC initially is even easily justifiable from the standpoint of rehabilitation, because the response teaches the prisoner that actions have consequences and that non-compliant conduct produces negative consequences. Using OC initially also enables the Department to maintain a secure facility where broader rehabilitation can occur.[381]

---

[381] The Commissioner testified that in each of the incidents that the plaintiffs present, the initial use of OC was justified and consistent with the Department's use-of-force policy. *See* Taylor Tr. 149–56. For purposes of this case, no one disputes that assessment. She also testified that one of the plaintiffs, Devon Young, was forced to wait for two hours with no decontamination because of a potential riot that put the facility in lockdown. *Id.* at 156–57. The plaintiffs cite Young's case not only because of the two-hour delay, but also because after officers came to take him to the medical facility, they did not allow any decontamination, including when he was standing in a shower stall changing his uniform and undergoing a strip search. They challenge the lack of Secure Decontamination, including Pre-Strip-Search Decontamination. *See* Hearing Tr. 225–26.

Once the prisoner is compliant and the area is secure, failing to facilitate Secure Decontamination serves none of those purposes. The prisoner simply suffers an arbitrary amount of additional pain for an arbitrary length of time. Some might argue that it serves the goal of deterrence, but it is not reasonably necessary to achieve that purpose. The fact that the prisoner has become compliant demonstrates that the OC has had its effect, making additional pain and suffering unnecessary and disproportionate. Moreover, the effectively random length and degree of additional pain and suffering render the consequence arbitrary. It is therefore reasonably likely to be cruel.

## V.    A THREAT OF IRREPARABLE HARM

The "*sine qua non* of preliminary injunctive relief" is "the threat that irreparable harm will befall them between now and trial unless an injunction issues."[382] Harm is irreparable unless "[a]lternative legal redress [is] clearly available and [is] as practical and efficient to the ends of justice and its prompt administration

---

To be clear, this case is only about Secure Decontamination. A lockdown would indeed justify a reasonable delay, and while the invocation of a security threat would not prevent judicial review, any assessment of an alleged constitutional violation would involve significant deference to the real-time assessments of officers and supervisors on the scene.

[382] *Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at *4 (Del. Ch. Aug. 7, 1989); *accord Nebeker v. Berg*, 115 A. 310, 311 (Del. Ch. 1921) ("Such [preliminary] injunction generally is employed to prevent mischief to come, and ought to do no more than preserve the status quo pending the decision of the cause at the final hearing on proofs taken." (internal quotation marks omitted)).

130

as the remedy in equity."[383] Showing irreparable harm is required because the purpose of a preliminary injunction is to preserve the status quo so that the court can hold a trial, make findings of fact, render conclusions of law, and issue a remedy. If there is no threat of irreparable harm, then the matter can be addressed through the final remedy.

To begin with, the denial of a constitutional right constitutes irreparable harm. "[I]f a constitutional violation is established, usually no further showing of irreparable injury is necessary."[384] The plaintiffs have established a reasonable likelihood of success on their claim that the failure to facilitate Secure Decontamination, including Pre-Strip-Search Decontamination, violates the Cruel Punishment Clause. That violation gives rise to irreparable harm.

The plaintiffs have also established that the threat a lack of Secure Decontamination poses to their health results in irreparable harm. "The courts have recognized that injuries to health are irreparable"[385] and that "[t]here can be no injury

---

[383] *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000) (first alteration in original) (internal quotation marks omitted).

[384] *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1224 n.2 (Del. Ch. 2022) (internal quotation marks omitted) (quoting 1A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2944 (3d ed.), Westlaw (database updated Oct. 2022)).

[385] *Malloy v. Eichler*, 628 F. Supp. 582, 598 (D. Del. 1986), *aff'd*, 860 F.2d 1179 (3d Cir. 1988).

more irreparable" than a "risk of serious, lasting illness or death."[386] As the plaintiffs have established, the extended exposure to OC from a lack of Secure Decontamination threatens irreparable harm through serious long-term health consequences in the form of injuries to the eyes, lungs, and skin. As the plaintiffs have shown, a lack of Secure Decontamination, including a lack of Pre-Strip-Search Decontamination, is likely to continue because of the Department's pervasive use of OC in Delaware's prisons, the absence of any practice of providing Secure Decontamination, and the inference that the Department's training methods, while well-intentioned, inure correction officers to the need for Secure Decontamination.[387]

## VI. BALANCING THE HARDSHIPS

The final element of the injunction standard is the balancing of hardships:

> [A] court must be cautious that its injunctive order does not threaten more harm than good. That is, a court in exercising its discretion to issue or deny such a preliminary remedy must consider all of the foreseeable consequences of its order and balance them. It cannot, in equity, risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent.[388]

Despite the plaintiffs' success so far, the equities counsel against granting the application.

At this phase of the case, the plaintiffs do not seek targeted mandatory

---

[386] *Thakker v. Doll*, 451 F. Supp. 3d 358, 365–67 (M.D. Pa. 2020).

[387] *See supra* Section I.E.

[388] *Lennane v. ASK Comput. Sys., Inc.*, 1990 WL 154150, at *6 (Del. Ch. Oct. 11, 1990) (Allen, C.).

injunctive relief. And with good reason. The court can only grant that form of relief when supported by essentially undisputed facts,[389] so that relief is unavailable now.

Instead, the plaintiffs seek a preliminary injunction preventing the Department from using OC until the implementation of a constitutionally adequate decontamination policy or a final adjudication on the merits. That form of relief would risk causing more harm than it would prevent.

Enjoining the Department from using OC would expose correction officers and prisoners to serious risk. The Commissioner testified credibly that OC is the safest and least-intrusive use of force available in a correctional setting and essential to maintaining security in Delaware prisons. OC and handcuffs are the only tools correction officers have—other than communication—to maintain order.[390]

If correction officers could not use OC, they would have to resort to other methods. They could use non-lethal, physical restraint techniques, such as joint locks or takedowns, but those techniques risk escalating encounters with non-compliant prisoners and bringing nearby prisoners into the fray. Depending on the relative size, strength, and skill of those involved, a correction officer could face a serious risk of injury. Alternatively, correction officers could use other non-lethal weapons, such as truncheons or batons, but correction officers must again engage with prisoners at

---

[389] *C & J Energy Servs.*, 107 A.3d at 1053–54.

[390] *See* Taylor Tr. 97 ("Correctional officers only have OC spray and handcuffs. That's the only tools that they have other than communication. To maintain order in a housing unit [of] up to 80 individuals, that's the only tool that they have.").

close range, creating safety risks.[391] Correction officers might also use conductive-energy devices known colloquially as tasers, but they have their own disadvantages.[392] The Commissioner testified credibly that those weapons pose a greater risk of pain and serious injury to prisoners than OC and that without the deterrent effect of OC, incidents of both non-compliance and prisoner-on-prisoner violence would likely increase.[393] Removing OC from the equation would likely also require that correction officers devote more time to maintaining security and less time to other duties. Those often include facilitating prisoner access to medical, mental health, and legal appointments, court hearings, and prisoner privileges.

---

[391] *See id.* at 96 (noting that OC "was first introduced to police/law enforcement agencies around the 1980s to replace instruments like the baton, where individuals would receive hard strikes to either bring them in control [or] effect an arrest"); *id.* at 97 (explaining that OC "replaces other control instruments like batons, expandable batons, tasers, going hands-on with a subject where injuries can occur," which "can create and escalate dangerous situations"); *id.* at 164 ("[I]f we do not have OC as a tool, then we will be going back to where we were at in the 1980s where there were batons. We would be going hands on with inmates. As you can imagine trying to break up a fight by going hands on and breaking up a fight versus being able to spray if they're not complying with the orders to stop fighting, there could be very different, different outcomes. I understand that the OC is uncomfortable. But the potential for serious physical injury from going hands on would be extremely high.").

[392] *See id.* at 165–66 (noting concern with using tasers in "close quarters" and that "when a taser is used, an individual can fall and hit their head").

[393] *Id.* at 166–67 ("OC is not only used to maintain order in a facility or to take someone into custody, it's also to maintain a safe facility for those residing in that facility as well. . . . If officers only have handcuffs and no longer have OC available for them to use, the inmates will very quickly learn that and there could be safety and security concerns without having a deterrent like OC to be able to intervene and take individuals into custody, to get them to comply with orders. It could end up being a safety and security concern for inmates and employees alike.").

The risks to safety that a preliminary injunction would create are too high. Balancing those equities counsels against issuing a preliminary injunction.

## VII.  CONCLUSION

The motion for a preliminary injunction is denied. The case must proceed to trial. Because of the significant interests that the case implicates, the parties must prepare the case for trial within 120 days.